IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | § | |
| EDWARD HENDRICKSON, | § | |
| | § | |
| Plaintiff-Relator | § | |
| | § | |
| v. | § | Civil Action No. 3:16-cv-292-M |
| | § | |
| BANK OF AMERICA, N.A., et al., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO
DISMISS THE AMENDED COMPLAINT UNDER RULE 12(B)(6) AND RULE 9(B)**

# TABLE OF CONTENTS

Page

I.   Relator Misstates the ACH Regulations. ................................................................ 2

    A.   Counts I and II Fail Because the Reclamation Process Applies to All Post-Death Payments. .......................................................................................................... 2

    B.   Count I Fails Because 31 C.F.R. § 210.4(c)(2) Does Not Provide That a Bank Acts Without Regulatory Authority By Receiving Post-Death Credit Entries. ...... 3

    C.   Count I Also Fails Because the Banks Do Not "Distribute" ACH Payments. ....... 5

    D.   Count II Fails Because 31 C.F.R. § 210.10(a) Does Not Say That RDFIs Must Immediately Return Post-Death Benefits Paid After a DNE Was Sent. ................. 6

II.   Relator Misunderstands Rule 9(b)'s Stringent Requirements. .......................................... 6

III.   Relator's Defense of Count I Fails. ................................................................................. 7

    A.   Relator Has Failed to Plead a False Statement. .................................................... 8

        1.   Relator Has Failed to Plead Express False Certifications. .......................... 8

        2.   Relator Has Failed to Plead a False Record or Statement With Particularity Under Rule 9(b). .................................................................... 10

    B.   Relator Has Failed to Plead a False Claim for Payment. ..................................... 12

        1.   The Banks Did Not Submit False Claims for Payment. ........................... 12

        2.   Relator Has Failed to Plead a False Claim With Particularity Under Rule 9(b). ......................................................................................................... 13

    C.   Relator Has Failed to Plead Materiality. ............................................................. 14

    D.   Relator Has Failed to Plead the Required Element of Scienter. ........................... 14

IV.   Count II Fails to Satisfy the Pleading Standards Established by Rules 9(b) and 8(a). ...... 16

    A.   Relator Has Failed to Plead Reliable Indicia of a Fraudulent Scheme. ................ 16

    B.   Relator Has Failed to Plead the Required Element of Scienter. ........................... 19

V.   Relator's Paragraph 74 Examples Undermine His Theories of Liability. ......................... 20

VI.   Relator Does Not Defend His Failure to State a Claim as to Certain Defendants. ............ 20

VII.   Relator Does Not Justify Awarding Personal Monetary Relief to Government Relators. 21

VIII.   Conclusion ................................................................................................................... 21

## Table of Authorities

**Cases**

*Baker v. Great N. Energy, Inc.*,
  64 F. Supp. 3d 965 (N.D. Tex. 2014) ................................................ 11

*Fowler v. Principal Fin. Grp.*,
  No. 12-cv-14, 2012 WL 13009206 (E.D. Tex. June 26, 2012) ............................. 21

*Sencion v. Saxon Mortg. Servs., Inc.*,
  No. 10-03108, 2011 WL 320231 (N.D. Cal. Jan. 28, 2011) ................................ 21

*United States ex rel. Bennett v. Boston Scientific Corp.*,
  No. 07-2467, 2011 WL 1231577 (S.D. Tex. Mar. 31, 2011) ................................ 9

*United States ex rel. Colquitt v. Abbott Labs.*,
  858 F.3d 365 (5th Cir. 2017) ........................................................ 10

*United States ex rel. Davis v. Lockheed Martin Corp.*,
  No. 09-0645, 2010 WL 4607411 (N.D. Tex. Nov. 15, 2010) ................................ 10

*United States ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ................................................... passim

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
  842 F.3d 430 (6th Cir. 2016) .................................................... 15, 17

*United States ex rel. Keaveney v. SRA Int'l, Inc.*,
  219 F. Supp. 3d 129 (D.D.C. 2016) ..................................................... 8

*United States ex rel. Little v. Shell Expl. & Prod. Co.*,
  690 F.3d 282 (5th Cir. 2012) ........................................................ 21

*United States ex rel. Price v. J-M Mfg. Co., Inc.*,
  No. 00-1755, 2001 WL 823730 (E.D. La. July 20, 2001) ................................. 7

*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) ....................................................... 17

*United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*,
  No. 14-00118-M, 2016 WL 5661644 (N.D. Tex. Sept. 30, 2016) ........................... 7

*United States ex rel. Steury v. Cardinal Health, Inc.*,
  735 F.3d 202 (5th Cir. 2013) ........................................................ 10

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
  778 F. Supp. 2d 709 (N.D. Tex. 2011) ................................................ 10

*United States ex rel. Wood v. Allergan, Inc.*,
  246 F. Supp. 3d 772 (S.D.N.Y. 2017) .................................................. 9

**Statutes**

31 U.S.C. § 3729(a)(1)(B) ............................................................ 14

31 U.S.C. § 3729(a)(1)(G) ............................................................ 16

31 U.S.C. § 3729(a)(2).................................................................................................. 12

31 U.S.C. § 3729(a)(2)(B) ........................................................................................... 13

**Other Authorities**

155 CONG. REC. S4531-01 (daily ed. Apr. 22, 2009) ...................................................... 19

S. REP. 111-10, *reprinted in* 2009 U.S.C.C.A.N. 430.................................................. 18

**Rules**

31 C.F.R. § 210.11(b)(1)................................................................................................. 2

31 C.F.R. § 210.10(a)................................................................................................ 2, 6, 7

31 C.F.R. § 210.11(a)................................................................................................. 2, 17

31 C.F.R. § 210.2(e)......................................................................................................... 4

31 C.F.R. § 210.4(c)(2)............................................................................................. passim

31 C.F.R. §§ 210.9-210.14........................................................................................ 5, 11

Fraud is supposed to be hard to allege. Relator must marshal together particularized facts and a supportable legal theory to move a case forward. Here, whether it relates to recurring benefit payments or responses to notices of reclamation ("NOR"), Relator has not met his burden.

To begin, Relator's legal arguments are flawed to their core. From the repeatedly false narrative that banks act as "gatekeepers" to the baseless legal argument that the NOR process and attendant deadlines do not apply after a Death Notification Entry ("DNE") is sent, Relator's description of the rules, regulations, and processes is wrong. Relying on these errors, Relator asks this Court to validate his novel legal argument that the Banks incur False Claims Act ("FCA") liability simply by failing to return post-death benefit payments *immediately*— regardless of whether there was any false certification, statement, or "claim." Relator simply ignores the Supreme Court's pronouncement that the FCA is not a tool to punish routine regulatory violations.

Considering Relator's false portrayal of the ACH system, it comes as no surprise that his factual allegations of fraud are absent. His effort to avoid pleading facts by instead citing "personal knowledge" is insufficient and must be rejected. Contrary to Relator's position, Rule 9(b) does not allow such "trust me" non-pleading and requires facts to be put on paper. As a result, for the recurring benefit payments and responses to NORs, all of the requisite details to establish fraud are lacking. Relator also neglects to develop or provide *any* plausible explanation for why 16 different banks would engage in a scheme that necessarily involves the funds being dissipated by third parties with access to deceased customers' accounts. Stated differently, Relator simply has done nothing to "move the needle" from alleged regulatory violation to fraud.

## I.     Relator Misstates the ACH Regulations.

On several critical points, Relator misstates the requirements of the ACH regulations, Green Book, and ACH Rules and the Banks' role in the ACH payment process. Because Relator's claims are premised on his false, self-serving construction of the ACH regulations, they should be dismissed.

### A.     Counts I and II Fail Because the Reclamation Process Applies to All Post-Death Payments.

Relator argues that the reclamation process does not apply to post-death benefit payments made after a DNE is sent to a Receiving Depository Financial Institution ("RDFI"). (Resp. at 4 n. 1, 11-13, 33-35.) Relator only now takes this position because he is well aware that the existence of a detailed reclamation process that allows federal agencies to recoup post-death payments defeats his self-effectuating Count II theory that the Banks are liable under the FCA with respect to the timing of the return of post-death payments.[1]

Relator relies on 31 C.F.R. §§ 210.10(a) and 210.11(a) and (b)(1) for his argument that the reclamation process is inapplicable to post-death payments made after a DNE was sent, yet those regulations do not limit the reclamation process in this way. Section 210.10(a) states that an "RDFI shall return any benefit payments received after the RDFI becomes aware of the death …of a recipient…" unless it has the right to limit its liability. Sections 210.11(a) and (b)(1) provide the circumstances under which an RDFI can limit its liability. Thus, while these provisions, read together, allow the Banks to limit liability to the government in certain circumstances as part of the reclamation process, neither provision exempts certain post-death payments from the reclamation process altogether, as Relator claims.

---

[1]As explained in the Banks' opening brief, the existence of the reclamation process also undermines Relator's theory on Count I that the Banks made false statements merely by accepting post-death benefit payments. (*See* Opening Br. at 18-19.)

The Green Book confirms that Relator's proposed limitation of the reclamation process is wrong. It states that "reclamation" is "a procedure used by the Federal government . . . to recover benefit payments made through the Automated Clearing House (ACH) to the account of a recipient who died or became legally incapacitated or a beneficiary who died before the date of the payment(s)." (Green Book, at 5-3, App. 112.) There is no exception set forth for payments that occur after a DNE was sent to an RDFI.[2]

Finally, Relator's own "examples" in Paragraph 74 of his Amended Complaint demonstrate that his theory is false. Relator claims that a DNE would have been sent in all of the examples, yet in almost half of the instances, Relator alleges that an NOR was sent as well. If Relator's theory were accurate, the VA would not send an NOR to collect post-death payments. The explanation for this inconsistency, of course, is that Relator is wrong.[3] The reclamation process applies to *all* post-death benefit payments.

### B.     Count I Fails Because 31 C.F.R. § 210.4(c)(2) Does Not Provide That a Bank Acts Without Regulatory Authority By Receiving Post-Death Credit Entries.

Relator's Count I "false statement" theory depends on an obvious misreading of § 210.4(c)(2). Relator claims that the ACH regulations revoke the Banks' "authorization to accept and distribute" post-death credit entries immediately upon the death of a benefit recipient, and therefore, "accepting such payments is necessarily a statement that the Banks are authorized to accept the payments because the beneficiary is not dead." (Resp. at 18) (emphasis in original). Relator's faulty and circular logic should be rejected.

---

[2] Green Book 5-10, which provides instructions related to NORs, further undermines Relator's argument as it provides that where an RDFI intends to return the full amount of post-death payments in response to an NOR, it need not return the Fiscal Service-133 form. One situation where an RDFI would do this is if there were post-death benefit payments made after the RDFI received a DNE. (*See* Green Book, at 5-10, App. 119.)

[3] Relator's current theory would come as a surprise to the government. Under this theory, Relator's Paragraph 74 examples demonstrate that the government acted improperly when it issued NORs to the Banks to collect post-death benefit payments made after a DNE was allegedly sent (even though, as some of the alleged examples demonstrate, the government received money from the Banks after they received the NORs).

Relator repeatedly cites § 210.4(c)(2) and Paragraph 24 of his Amended Complaint to support his argument that the Banks' authorization to accept ACH credit entries ends immediately upon the death of a recipient. But in Paragraph 24, Relator incorrectly alleges that the Banks, as RDFIs, become an "authorized payment agent" for a benefit recipient pursuant to § 210.2(e), and that the authorization terminates upon the death of the recipient. (Am. Compl. ¶ 24.) The Banks pointed out this misstatement of the law in their opening brief, noting that an "authorized payment agent" is a defined term in the ACH regulations, and the Banks do not fall within that statutory definition. (Opening Br. at 6 n. 5.) Relator dismisses this critical pleading error as "mere semantics." (Resp. at 6 n. 2.) Of course, regulatory definitions and requirements are not "mere semantics." Relator's failure to address his misstatement of the law head on is a concession that the allegation is wrong and cannot support his theory of Count I.

Further conceding the point, Relator has abandoned his "authorized payment agent" argument. He now argues that the Banks "certainly act as authorized agents" of recipients, and that the Banks' general "regulatory authority" is what terminates under § 210.4(c)(2) when a recipient dies. (Resp. at 3, 6 n. 2, 17-18.) However, the Banks do not act as "authorized agents" of benefit recipients, nor does Relator cite any authority for that point. Further, the language in § 210.4(c)(2) relating to termination of an "authorization" upon the death of a recipient speaks specifically to the "authorization" the recipient gave to the federal agency to initiate credit entries, not to any authorization given to the Banks. (Opening Br. at 6 (citing ACH Rules, Operating Rules § 2.3.1).) Section 210.4(c)(2) does not broadly mean that all entities involved in the ACH payment process, including the Banks, lose their "authorization" or "regulatory authority" upon the death of a benefit recipient or that they act outside the scope of their "regulatory authority" in handling erroneously-sent post-death benefit payments which are

subject to the reclamation process. *See* 31 C.F.R. §§ 210.9-210.14; Green Book, Part 5, App. 110-39. In fact, that course of events is exactly what the ACH regulations and the Green Book contemplate. *Id.* Relator has entirely misstated the meaning of § 210.4(c)(2) in a failed attempt to satisfy the "false statement" component of his Count I FCA claim. *See infra*, Section III.A.1.

C.     **Count I Also Fails Because the Banks Do Not "Distribute" ACH Payments.**

Relator also premises Count I on the false notion that there is a "two-step process" by which Banks first receive and then "decide to deposit" or "distribute" funds into individual accounts. (Resp. at 4.) This is pure fiction, as there is no such two-step process in the ACH regulations, Green Book, or ACH Rules, nor has Relator offered any rationale for how these provisions could be so interpreted. Relator can only be describing the role of the ACH Operator: the entity that serves as "a central clearing facility that receives entries from ODFIs, ***distributes*** the entries to appropriate RDFIs, and performs the settlement functions for the financial institutions." (*See* ACH Rules, at OG2, App. 409) (emphasis added). The Banks are not ACH Operators, but RDFIs. (Opening Br. at 4-5.)

Further, the federal agency sending the payment (the Originator) warrants to the RDFI that the payment "has been properly authorized." (*Id.* at 6.) Relator ignores this warranty because it undermines his claims. The Banks do not "decide to deposit" or "distribute" funds into individual accounts. Rather, the Banks have no discretion to reject entries that comply with the ACH Rules. (*Id.* at 6-7.) The RDFI simply posts the entry to the recipient's account as required. (*Id.* at 5.) Relator dismisses these critical points, insisting that the Banks must make "independent determinations" instead of "blindly relying on a Federal agency 'warranty,'" (Resp. at 5) but he offers no support for this claim when the ACH Rules mandate the opposite.[4]

---

[4]Relator consistently cites to his own allegations, rather than any legal authority. For example, Relator insists that "the ACH process is designed so that Federal agency funds do not automatically flow through to individual bank

Relator insists that the Banks can reject post-death credit entries because they do not comply with the ACH Rules in that the "authorization" for such payments is revoked immediately upon a recipient's death under § 210.4(c)(2). (Resp. at 6.) As set forth above, this argument is incorrect as a matter of law because Relator misstates the meaning of "authorization" under the ACH regulations and ACH Rules. *See supra*, Section I.B.

### D. Count II Fails Because 31 C.F.R. § 210.10(a) Does Not Say That RDFIs Must Immediately Return Post-Death Benefits Paid After a DNE Was Sent.

Count II depends on the flawed reasoning that § 210.10(a) requires the Banks to "immediately" return post-death benefit payments received after they learn a recipient is deceased, *i.e.*, after a DNE has been received by the RDFI. But the plain language of § 210.10(a) contains no such timing requirement. Indeed, while § 210.10(a) states that a Bank "shall return any benefit payments received after the RDFI becomes aware of the death . . . of a recipient," it does <u>not</u> state that the Banks must do so immediately. The word "immediately" in § 210.10(a) does not apply to the return of post-death benefit payments, but to the RDFI's notification to the agency. 31 U.S.C. § 210.10(a) ("the RDFI shall immediately notify the agency of the death or incapacity" of a recipient. . . .") Relator is asking this Court to impose unprecedented FCA liability on the Banks using language that cannot be found in § 210.10(a).[5]

## II. Relator Misunderstands Rule 9(b)'s Stringent Requirements.

Relator must allege a violation of the FCA with "particularity" under Rule 9(b). Relator's Response, however, evinces a fundamental misunderstanding of the Rule. He claims "the purpose of Rule 9(b) is to provide the Banks with 'fair notice' of the allegations against them." (Resp. at 25.) Relator oversimplifies his heightened pleading requirement; the actual purpose of

---

accounts…" (Resp. at 4.) All Relator cites for this argument is Paragraph 20 of his Amended Complaint. Relator cannot support his interpretation of the ACH regulations by citing only to his own argumentative allegations.
[5] In Section IV.A, *infra*, the Banks discuss in more detail the interplay of § 210.10(a) and Green Book 5-8 and 5-9 and why Relator's Count II theory that Banks must immediately return post-death payments fails as a matter of law and fails under Rule 9(b).

the Rule is far more multi-faceted. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (describing "Rule 9(b)'s objectives of ensuring the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs") (internal quotation marks omitted).

Relator's misunderstanding extends to Rule 9(b)'s reach and requirements as well. He insists that his "experience and position" alone "establishes a sufficient 'reliable indicia' to support his allegations—without need for all details." (Resp. at 30.) In other words, Relator urges, "trust me." But conclusory allegations and a plaintiff's assurance of "personal knowledge" do not substitute for pleading facts, nor do they satisfy Rule 9(b). Indeed, the very case on which Relator attempts to rely proves the point. *See United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, No. 14-00118-M, 2016 WL 5661644, at *6-8 (N.D. Tex. Sept. 30, 2016) (finding reliable indicia of an alleged scheme where relator alleged specific *facts* concerning her personal knowledge of the defendant's conduct and provided *details* in the complaint). Such facts and details—the who, what, when, where, and how of the fraud—are entirely absent from the Amended Complaint. *See also United States ex rel. Price v. J-M Mfg. Co., Inc.*, No. 00-1755, 2001 WL 823730, at *2 (E.D. La. July 20, 2001) (noting that where a relator "alleges personal knowledge, [he] has no excuse for failing to allege more particular information regarding [fraudulent] acts").

## III.   Relator's Defense of Count I Fails.

With respect to his Count I claim under § 3729(a)(1)(B), Relator must plead that the Banks made or used a record or statement, that the record or statement was false, that the Banks knew the record or statement was false, and that the record or statement was material to a false

claim. (Opening Br. at 15-16); *see also United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 153 (D.D.C. 2016). Relator does not disagree that he is required to plead both a false statement and a false claim to which that statement was material, *i.e.*, double falsity. (Resp. at 16-17.) Relator fails to plead these required elements, and Count I should be dismissed.

### A.      Relator Has Failed to Plead a False Statement.

Relator characterizes Count I as an express false certification claim, expressly conceding that he cannot proceed on an implied certification theory. (Resp. at 19-20.) The plain language of the ACH regulations, Green Book, and ACH Rules contradict Relator's theory of liability, and Count I should be dismissed accordingly.

### 1.      Relator Has Failed to Plead Express False Certifications.

Relator's argument that the Banks make false statements and ongoing express certifications of compliance with the ACH regulations merely by accepting ACH transfers finds no support in the ACH regulations or Rules. Relator's attempt to cobble together an express certification from these sources is groundless and improper. Indeed, it is the opposite of what "express" means.

None of the three provisions cited by Relator contains any "express" certification:

- 31 C.F.R. § 210.9 states: "An RDFI's acceptance of a benefit payment pursuant to this part shall constitute its agreement to this subpart."

- Green Book 5-3 states: "By accepting a recurring benefit payment from the government, a receiving depository financial institution (RDFI) agrees to the provisions of 31 CFR 210, including the reclamation and debiting of the RDFI's Federal Reserve Bank account for any reclamation for which it is liable. . . . This contract is renewed by the RDFI each time it accepts and credits an ACH payment on behalf of a depositor." (App. 112.)

- 31 C.F.R. § 210.4(c)(2) states: "An authorization shall remain valid until it is terminated or revoked by . . . [t]he death or legal incapacity of a recipient of benefit payments . . . ."

Courts agree that an express false certification occurs "only when a party affirmatively and explicitly certifies compliance with a statute or regulation . . . ." *United States ex rel. Bennett v. Boston Scientific Corp.*, No. 07-2467, 2011 WL 1231577, at *13 (S.D. Tex. Mar. 31, 2011); *see also United States ex rel. Wood v. Allergan*, Inc., 246 F. Supp. 3d 772, 810 (S.D.N.Y. 2017) ("Express legal falsity generally arises where a government program requires participants to submit forms explicitly stating that they have complied with certain statutes.") (internal quotations omitted).

Relator's express false certification theory fails because the Banks do not make any such affirmative representation that they have complied with the ACH regulations merely by accepting an ACH credit entry. Nor do the Banks make any express certification that the agency's transfer of funds to the intended recipient was proper. All the Banks do is make a forward-looking agreement to comply with the regulations. (Opening Br. at 18.)

Equally meritless is Relator's contention that the Banks' acceptance of post-death credit entries "necessarily" constitutes a false statement specific to the Banks' authorization to accept and distribute payments. Relator argues that under § 210.4(c)(2), the Banks' "authorization" to accept and distribute payments ends immediately upon the death of a recipient, rendering the Banks' acceptance of *any* post-death credit entry an automatic violation of the ACH regulations and, consequently, a false statement that the Banks are in compliance with the ACH regulations. (Resp. at 17-18.) Relator's argument is belied by the ACH regulations, Green Book, and ACH Rules. The Banks do not "distribute" payments received via the ACH network. *See infra*, Section I.C. Further, under the ACH regulations and Rules—including § 210.4(c)(2)—the Banks do not make any representation of any kind that an ACH payment is authorized merely by accepting the payment. It is the federal agency (acting as the Originator) that warrants that a payment is

9

authorized, not the RDFIs. *See infra*, Section I.B, C. Finally, Relator's claim is contrary to the ACH regulations, ACH Rules, and Green Book, which specifically contemplate that post-death benefit payments will sometimes be paid to deceased recipients in error and will be subject to a mandatory reclamation process. *See infra*, Section II.B; *see also* 31 C.F.R. § 210.9-210.14; Green Book, Part 5, App. 110-39.

### 2. Relator Has Failed to Plead a False Record or Statement With Particularity Under Rule 9(b).

Relator's inability to identify an express "false record or statement" also demonstrates his failure to satisfy the heightened pleading requirements of Rule 9(b), which requires "at a minimum, that a plaintiff set forth the who, what, when, where, and how of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 204 (5th Cir. 2013).[6] Even assuming Relator were able to identify an express statement or certification made by an RDFI (which he cannot), he would also be required to allege particularized facts to confirm that all 16 Banks made such express statements here, *and* that those statements were false or fraudulent.

The Amended Complaint falls well short of this standard, and Relator's efforts to rehabilitate it fail. Indeed, in "summariz[ing]" the Amended Complaint's supposed details, (Resp. at 27), Relator simply rehashes his flawed theory of liability, contending that the requisite "what" is satisfied by allegations that the "16 defendant Banks made knowingly false statements

---

[6]Citing *Grubbs*, Relator suggests he is "not required" to "detail the 'who, what, when, where, and how' of the Banks' fraudulent conduct." (Resp. at 27). Yet the Fifth Circuit has reiterated after *Grubbs* that relators must plead these specifics "at a minimum." *Steury*, 735 F.3d at 204; *see also United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 371 (5th Cir. 2017). The *Grubbs* court noted that where a relator "cannot allege the details of an actually submitted false claim," he "may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.  While this articulation recognizes that "there is no single construction of Rule 9(b) that applies in all contexts," *id.* at 188, it does not supplant longstanding baseline requirements established by the Rule. *See United States ex rel. Davis v. Lockheed Martin Corp.*, No. 09-0645, 2010 WL 4607411, at *6 (N.D. Tex. Nov. 15, 2010) (noting that because "Rule 9(b) is context specific and flexible," the "level with which a plaintiff must particularly state the circumstances constituting fraud or mistake depends on the elements of the claim at hand" (citing *Grubbs*, 565 F.3d at 188)). *Cf. United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 716-17 (N.D. Tex. 2011) (Lynn, J.) (dismissing FCA claim under Rule 9(b)).

by continually certifying their compliance with ACH regulations," that the "who" is "[t]he 16 defendant Banks," and that the "where" is "each" of the 16 Banks' "locations that received Federal agency recurring benefit payments." *Id.* This recitation does nothing to cure the pleading deficiencies outlined by the Banks. At base, Relator attempts to support a claim which turns on an express false statement with little more than a conclusory allegation of fraud against 16 different banks. The result is a pleading which lacks the "requisite details" to satisfy Rule 9(b). *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 974 (N.D. Tex. 2014).[7]

Even if Relator *could* identify statements made by the Banks, his Amended Complaint supplies no particularized facts to establish their *falsity*. Relator's theory of falsity hinges entirely on his contention that the Banks *knew* that their customers were deceased but continued to accept credit entries to their accounts. (*See* Opening Br. at 39-43.) Yet this central cog in Relator's case is based only on his supposition that the Banks "would have" received a DNE from SSA. (*See* Am. Compl. ¶¶ 39, 41, 59.) This conjecture is plainly insufficient to sustain his claim of a years-long fraudulent scheme across 16 different Banks. Relator's response on this point makes scant sense. He insists that the "phrasing" of the allegation is intended merely to note "a fact of timing"—*i.e.*, that "the Banks' fraudulent conduct occurred only after the Banks accepted post-death payments after they 'would have' already received the DNEs." (Resp. at 9 & n.3.) This explanation is little more than obfuscation, and certainly does nothing to solve the Amended Complaint's lack of factual detail concerning falsity. Stated simply, Relator must allege—*with particularity*, and as to *each* Bank—the actual facts which support the conclusion that the Banks

---

[7]Relator's allegations are particularly deficient when compared with those the Court found to satisfy Rule 9(b) in *Grubbs*. *See Grubbs*, 565 F.3d at 192 (noting that the complaint described, among other things, "the date, place, and participants" of meetings central to the alleged scheme as well as details regarding the medical services that were improperly billed).

knew that recipients had died and yet continued to accept credit entries to their accounts. Relator merely assumes that the Banks "would have" received DNEs from SSA.

The simple fact is that the Amended Complaint *nowhere* alleges that even *one* of the 16 Banks actually received a DNE for those recipients for whom the Banks accepted post-death credit entries. Indeed, elsewhere in his briefing, Relator appears to concede that he is speculating on when and whether DNEs were actually sent. (*See, e.g.*, Relator's Resp. to Statute of Limitations Br. at 10 (claiming that "only the banks know when they received DNEs"); Relator's Resp. to Public Disclosure Bar Br. at 29 (indicating that Relator actually learned of the existence of DNEs from his SSA counterparts, not from his own investigative work).) Rule 9(b) is designed specifically to thwart such speculative claims at the pleading stage. *See Grubbs*, 565 F.3d at 190 (noting that "Rule 9(b)'s objectives" include "prevent[ing] plaintiffs from filing baseless claims then attempting to discover unknown wrongs").

### B. Relator Has Failed to Plead a False Claim for Payment.

#### 1. The Banks Did Not Submit False Claims for Payment.

Relator failed to plead that any false claims were made to the government. Relator attempts to remedy this error by arguing that it should be obvious the Banks submitted false claims and acted on behalf of deceased benefit recipients in doing so. Relator's theory ignores the obvious, which is that he must establish that a false "claim," as defined in the FCA, was actually made. To establish a "claim" under the FCA, Relator must allege a "request or demand . . . for money or property." 31 U.S.C. § 3729(a)(2). The Banks' mere acceptance, through the ACH system, of post-death credit entries is not a "request or demand" that those payments be made by the government. Relator's allegations confirm that the only request or demand for benefit payments was made by the recipients and that they were legitimate when made. (Am. Compl. ¶¶ 17, 20-21, nn. 4-5 (claiming that the ACH payments were made to eligible

12

recipients).) Relator offers no authority for his argument that the Banks' acceptance of ACH credit entries can be construed as an affirmative request or demand for payment. And in fact, as the Banks explained in their opening brief, some act beyond mere receipt and retention of an overpayment is required to find that a request or demand was made. (Opening Br. at 24.)

Further, Relator's attempt to support his theory by distorting the ACH regulations is equally unavailing. Relator argues that "[o]nce authorized, the Banks (rather than the recurring benefit recipients) are the entities charged with requesting—and ceasing to distribute upon learning of the recipients' deaths—the funds from the Federal agencies that are then distributed to the intended beneficiary." (Resp. at 21.) Nowhere in the ACH regulations, Green Book, or ACH Rules does it state that a bank, acting as an RDFI, becomes authorized to act on behalf of a recipient in requesting federal benefit payments from the federal government as described by Relator. Relator again cites no authority in support of his position.

In addition, Relator entirely dismisses the exclusion to the definition of a "claim" set forth in § 3729(a)(2). Once again, statutory definitions are not "mere semantics," nor are they insignificant to resolution of Relator's statute-based claims. Any claim by Relator premised on "requests or demands for money or property that the Government has paid to an individual as compensation…or as an income subsidy with no restrictions" cannot be the basis of an FCA action. *See* 31 U.S.C. § 3729(a)(2)(B). (*See also* Opening Br. at 24-26.)

## 2.    Relator Has Failed to Plead a False Claim With Particularity Under Rule 9(b).

Inasmuch as Relator fails to plead a false claim for payment, Relator necessarily cannot state a § 3729(a)(1)(B) claim under Rule 9(b). By failing to include any facts to identify a false claim for payment (the requisite "what" under Rule 9(b)), Relator did not and cannot plead the remaining elements of who, when, where, or how. *See supra*, Section III.A.2.

13

**C.      Relator Has Failed to Plead Materiality.**

The absence of a false statement or claim necessarily means that Relator cannot establish the requisite materiality. Moreover, under Relator's theory, the Banks' purportedly false statements were allegedly made upon receipt of the payment. Such purported false express certifications would have occurred *after* the payment was made, and therefore, could not be material to the government's payment decision, which preceded the payment. (Opening Br. at 26-28.)

**D.      Relator Has Failed to Plead the Required Element of Scienter.**

Count I also fails because Relator has not alleged facts sufficient to permit the plausible inference that the Banks acted "knowingly." 31 U.S.C. § 3729(a)(1)(B). Relator insists that he has supplied "detailed facts from which the Court can infer that the Banks acted with at least reckless disregard or deliberate ignorance," (Resp. at 32), but these purported "facts" fall well short of establishing that each of 16 different Banks individually met this standard. Indeed, each of the facts listed in Relator's Response (*Id.* at 32-33), to the extent they even could be separated from conclusory assertions and inference, are no more suggestive of fraud than mere administrative errors or mistakes by the Banks—certainly understandable (and anticipated) given the magnitude of the federal benefits programs. Recognizing this, Relator once again falls back on his purported personal knowledge, claiming that his "investigations over the course of many years found that the Banks' misconduct did not involve isolated incidents," and "that on numerous occasions the Banks misrepresented their knowledge." (*Id.* at 32.) Here again, Relator asks the Court to find that the Amended Complaint passes muster based only on Relator's unadorned assurance that the Banks are liable.

Relator then attempts to supplement this "personal knowledge" with inferences, arguing that:

14

> It is certainly reasonable for this Court to infer from the [Amended Complaint's]
> allegations that, at a minimum, the Banks knew how to follow ACH regulations,
> were more than capable of doing so, failed to do so on a routine basis, and
> benefitted as a result from such conduct.

(*Id.* at 33). As a defense of his purported ability to establish scienter, this is particularly weak.

Relator never provides a factual basis from which to infer the Banks acted knowingly, thereby

suggesting that the Court must make inferences upon inferences to find this critical element

plausibly pled. *See also United States ex rel. Harper v. Muskingum Watershed Conservancy

Dist.*, 842 F.3d 430, 438 (6th Cir. 2016) (affirming dismissal where district court declined to

speculate upon missing facts by making "inference upon inferences"). What is more, simply

because the Banks were "knowledgeable and experienced participants in the ACH system," with

"a business incentive to continue" depositing payments into deceased recipients' accounts,[8] it

does not follow that they knowingly engaged in a scheme to do so. (Resp. at 32-33.) It is the

height of conjecture to suggest that the mere possibility of profiting from a scheme establishes

that the defendant in fact knowingly undertook that scheme.

Finally, Relator claims that unnamed representatives of "the Banks" admitted to

knowledge of recipient deaths and the continued acceptance of credit entries thereafter. Yet

despite the fact that these representatives supposedly made these admissions "*to Relator*"

himself, he cannot identify a single one, nor can he identify the banks for which they worked.

(*Id.* at 32). Once again, Relator's "because I said so" defense falls short.

---

[8] As the Banks demonstrated in their opening brief, the Amended Complaint discloses no plausible motive for the Banks' alleged conduct. Thus, there plainly is no "business incentive" for the massive risk allegedly being undertaken by the Banks. The improper payments at issue would either remain in the deceased recipients' accounts—in which case, Relator agrees that they would eventually be reclaimed by the government (as there is no claim of hidden funds)—or they would be dissipated by individuals having access to the accounts. To the contrary, the Banks would only increase their liability under the ACH regulations. In fact, the Banks actually must pay the government the first 45 days of post-death benefits out of their own pocket, if the agency cannot make a recovery. *See* 31 C.F.R. § 210.11(a).

**IV.     Count II Fails to Satisfy the Pleading Standards Established by Rules 9(b) and 8(a).**

**A.      Relator Has Failed to Plead Reliable Indicia of a Fraudulent Scheme.**

Count II—which advances a reverse false claim theory—also fails under Rule 9(b).

Count II is brought under the FCA provision that assigns liability to anyone who:

> knowingly makes, uses, or causes to be made or used, a false record or statement
> material to an obligation to pay or transmit money or property to the Government,
> or knowingly conceals or knowingly and improperly avoids or decreases an
> obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). As the Banks previously explained, Relator fails to offer any

"particular details of a scheme to submit false claims paired with reliable indicia that lead to a

strong inference" that such fraud was actually committed. *See Grubbs*, 565 F.3d at 190. Relator's

original central theory was that the Court should infer that a bank submitted a false certification

in response to an NOR whenever it fails to return the full amount of the post-death payments.

(Am. Compl. ¶¶ 83-85.) Relator assumes that the Banks received a DNE and therefore that they

"routinely" limited their liability by falsely certifying the dates they first learned of recipients'

deaths. (*Id.* ¶ 59.) Yet Relator supplies no details about these purportedly fraudulent responses at

the heart of his alleged scheme, leaving no "reliable indicia" that such a scheme ever existed.

Relator's Response pivots to a broader theory, which is equally flawed and that

dramatically expands the scope of Count II. "No false document is necessary," Relator now

urges, because § 3729(a)(1)(G) "liability can involve one who 'avoids' an obligation to pay

money back to the Government." (Resp. at 30.) According to Relator, under this new, self-

effectuating liability theory, the "Banks were immediately obligated to return all post-death

benefits received after the Banks learned that a person died" and face liability under the FCA for

"avoiding" repayment if they fail to do so—whether the Government timely issues an NOR or not. (*Id.*)[9] This expanded Count II fails for three reasons.

**First**, Relator's self-effectuating new theory finds no support in the ACH regulations. As previously explained in Section I.D, § 210.10(a) does not require immediate return of post-death benefit payments. And the Green Book contradicts Relator's new theory, noting—under the heading "What to do upon Notification of Death with Payments Already Posted and Subsequent Payments"—that an RDFI "does not *have* to wait for a Notice of Reclamation," and "*can* immediately return all subsequent post-death benefit payments to the Government Disbursing Office." (Green Book, at 5-9, App. 118) (emphases added). Were the obligation to return funds as immediate—and the consequences as dire—as Relator suggests, the Green Book would not use such plainly permissive language; it would impose the obligation Relator seeks to create.[10]

**Second**, even if the ACH regulations were rewritten to require RDFIs to *immediately* return all post-death benefit payments, a bank's failure to do so would certainly not trigger liability for *fraud* under the FCA. It would constitute only a breach of § 210.10, which the courts agree is beyond the FCA's purview. As the Supreme Court recently confirmed, the FCA is *not* "a vehicle for punishing garden-variety . . . regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016). Yet Relator's reimagined Count II

---

[9] Relator appears to have abandoned his fraudulent *response* theory entirely, claiming now that "the initiation of the formal reclamation process with a Notice of Reclamation was not the triggering basis for . . . liability." (*Id.* at 30 n.21.) The Amended Complaint tells a different story. (*See, e.g.*, Am. Compl. ¶¶ 59, 64.)

[10] The Banks were entitled to rely on this clear statement from the Green Book, which is consistent with § 210.10(a), notwithstanding other statements in the Green Book that Relator argues create an obligation to immediately return post-death benefit payments. (*See* Green Book, at 5-8, App. 117.) Indeed, even were the Banks incorrect in their understanding of the plain language of § 210.10 and their obligation to follow the reclamation process, courts agree that the FCA does not "reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015). Any interpretation by the Banks regarding the Green Book that is consistent with § 210.10(a) is thus unequivocally reasonable. *See also Harper*, 842 F.3d at 437 (holding that in a reverse false claims case the FCA's scienter standard "requires plaintiffs to prove that the defendant knows that he violated an obligation, not simply that he mistakenly interpreted a legal obligation") (internal quotes omitted).

contorts § 3729(a)(1)(G) into just that. (*See* Resp. at 30 ("The Banks were immediately obligated to return all post-death benefits received after the Banks learned that a person died, but the Banks avoided that obligation."); *see also id.* at 30 n.21.) At base, Relator claims that—quite unlike the government—the Banks must execute their limited role in the ACH process perfectly each time—or else face liability for *fraud*. This interpretation would improperly turn § 3729(a)(1)(G) into a strict liability statute, under which the simple lapse of time between a bank's receipt of a DNE and its return of funds to the government would trigger massive FCA liability under an "avoidance" theory. *See United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 743 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009) (rejecting argument that "would transform every inaccurate claim into a false claim and consequently replace the Act's knowledge requirement with a strict liability standard").

The FCA's legislative history confirms that Congress never intended § 3729(a)(1)(G) to be applied as Relator now urges. While "the violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment," Congress did *not* "intend this language to create liability for a simple retention of an overpayment that is permitted by a statutory or regulatory process for reconciliation." S. REP. 111-10, at 15, *reprinted in* 2009 U.S.C.C.A.N. 430, 442. Treasury's reclamation process is just such a "regulatory process for reconciliation" designed to allocate and determine liability for post-death payments. Plainly then, banks do not face FCA liability if they allow the reclamation process to run its course as intended.[11] (*See* Green Book, at 5-9, App. 118.)

---

[11] Relator's reading of § 3729(a)(1)(G) is also flawed because it simply ignores the word "improperly" in that section. While Relator asserts that "'reverse false claim' liability can involve one who 'avoids' an obligation to pay money back to the Government," (Resp. at 30), the statute reserves such liability for one who "knowingly and *improperly* avoids" such an obligation, 31 U.S.C. § 3729(a)(1)(G) (emphasis added). *See* 155 CONG. REC. S4531-01

**Finally**, Relator's expanded Count II liability theory actually *exacerbates* rather than addresses the Amended Complaint's Rule 9(b) deficiencies. The sweeping interpretation of § 3729(a)(1)(G) liability that Relator urges is left completely unsupported with any "particular details" to support this purportedly fraudulent "scheme." *Grubbs*, 565 F.3d at 190. This is hardly surprising. Under Relator's theory, liability would attach virtually the minute a DNE is sent. This is not a fraudulent "scheme" at all, but rather an attempt by Relator to attach liability to a routine step in the regulatory process. The "circumstances constituting fraud" thus remain entirely absent, and certainly not pled with any "particularity." Fed. R. Civ. P. 9(b). Relator identifies no parties responsible for the scheme, no method of concealment, and no motive. And, of course, Relator has not alleged when—or even *if*—a DNE was actually sent. *See supra* Section III.A.2. Given the absence of such critical details, and no facts to suggest any actual *fraud*, Count II supplies no "reliable indicia that lead to a strong inference" that the Banks improperly avoided an obligation to the United States and fails as a matter of law. *Grubbs*, 565 F.3d at 190.

### B.     Relator Has Failed to Plead the Required Element of Scienter.

As previously explained, Relator alleges no facts which plausibly establish that the Banks "knowingly" engaged in fraud. *See supra* Section III.D. Moreover, the deficiencies in Relator's Response set forth above are particularly critical with respect to Count II given Relator's pursuit of "more reaching" liability under § 3729(a)(1)(G). (Resp. at 30, n.21.) Because Relator now urges that a falsified response to an NOR is not necessary, he must allege that the mere failure to "immediately" return post-death payments was done "knowingly"—by all 16 Banks. He fails to do so.

---

(daily ed. Apr. 22, 2009), at S4539–40 (2009) ("Given that the words 'knowingly and improperly' have a fixed meaning that, at the very least, requires either improper motives or inherently improper means, the changes made by this bill cannot be read to make actionable the retention of an overpayment when the defendant is pursuing in good-faith the exhaustion of a reconciliation procedure."). Relator's failure to address this language speaks volumes.

**V.      Relator's Paragraph 74 Examples Undermine His Theories of Liability.**

Relator's Paragraph 74 examples are irreconcilable with his flawed and overreaching positions. Not only do these examples fail to support his more generalized allegations of fraud, they plead him out of court. Based on Relator's examples, it is clear the VA had actual or constructive knowledge of the death of a recipient, but did not send an NOR within 120 days as required under § 210.10. Relator stands in the shoes of the government, and has no greater rights than the government. Because Relator's examples confirm that the government would have no claim, Relator also has no claim.

Relator's attempt to dismiss the ACH regulations' 120-day requirement is groundless. His claim that certain post-death benefit payments are not subject to the reclamation process is wrong. *See supra*, Section I.A. Further, Relator's argument that the 120-day requirement incentivizes bad conduct is untrue. The Banks do not keep post-death payments. Those amounts are either held in individual accounts or are used by the account owners, not the Banks. The Banks have zero incentive to wrongfully refuse to return post-death payments, as they are subject to increased liability each time a benefit payment is made.

**VI.     Relator Does Not Defend His Failure to State a Claim as to Certain Defendants.**

As discussed above, Relator attempts to dodge his failure to allege examples of NORs being sent to certain defendants. Relator abandons his earlier theory and now claims that he need not plead false certifications in response to NORs because the Banks violated the FCA merely by failing to return post-death benefit payments immediately. (Resp. at 30-31.) For the reasons stated above, this strict liability theory must be rejected. *See supra*, Section IV.A. Indeed, the absurdity of Relator's position is born out in one of his examples. In Paragraph 74(f), Citibank fully repaid the government in response to an NOR, yet Relator claims it should be held liable under the FCA for failing to return the post-death benefit payments immediately. Congress

20

specifically sought to avoid this very abuse of the FCA, by including language in the statute to make sure that good faith exhaustion of a reconciliation process would not be punished.[12]

## VII.   Relator Does Not Justify Awarding Personal Monetary Relief to Government Relators.

Relator does not deny that the government-employee conflict-of-interest rules bar him from receiving a *qui tam* award, nor could he do so. Nor does he deny that allowing government relators to personally gain from their employment by bringing claims based upon information learned as a fraud investigator for the VA OIG, creates "perverse incentives." (Opening Br. at 48.) Instead, Relator claims that there is "no basis for this Court to entertain this issue now, and no basis to ever find that the Banks have standing to raise it." (Resp. at 37.) But under Rule 12, a defendant may, before answering, move the Court to "strik[e] any part of the prayer for relief when the relief sought is not recoverable as a matter of law." *Sencion v. Saxon Mortg. Servs.*, Inc., No. 10-03108, 2011 WL 320231, at *1 (N.D. Cal. Jan. 28, 2011). Relator's personal monetary requests are part of his Prayer for Relief "against Defendants." (Am. Compl. at 31.)

Relator's response that the Fifth Circuit has refused to bar government relators (Resp. at 37-38), conflates standing with his right to personal monetary relief, which the Fifth Circuit has not decided. *See United States ex rel. Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 285 & n.2 (5th Cir. 2012).

## VIII.   Conclusion

Accordingly, Defendants respectfully request that the Court enter an Order dismissing Relator's Amended Complaint with prejudice.

[signature pages follow]

---

[12]Additionally, Relator fails to respond to the Banks' arguments regarding Paragraph 74(f), and thus the issue is "considered waived." *Fowler v. Principal Fin. Grp.*, No. 12-cv-14, 2012 WL 13009206, at *2 (E.D. Tex. June 26, 2012).

Respectfully submitted,

/s/ Justin R. Opitz
Justin R. Opitz
State Bar No. 24051140
McGuireWoods LLP
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
(214) 932-6400
Fax: (214) 932-6499
jopitz@mcguirewoods.com

Jeremy S. Byrum
McGuire Woods, LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-4305
Fax: (804) 698-2080
jbyrum@mcguirewoods.com

ATTORNEYS FOR WELLS FARGO
BANK, N.A., including as successor in
interest to WACHOVIA BANK, N.A.

/s/ Thomas V. Panoff
Lucia Nale
(Bar No. 6201684IL)
Thomas V. Panoff
(Bar No. 6283695IL)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Telephone)
(312) 706-8297 (Facsimile)

Keith M. Aurzada
(Bar No.  24009880)
Bradley J. Purcell
(Bar No. 24063965)
BRYAN CAVE LLP
2200 Ross Avenue, STE 3300
Dallas, Texas 75201
Telephone 214-721-8000
Facsimile 214-721-8100

ATTORNEYS FOR DEFENDANT
CITIBANK N.A.

/s/ Jason M. Hopkins
David W Klaudt
State Bar No. 00796073
Jason M. Hopkins
State Bar No. 24059969
Greenberg Traurig LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75201
(214) 665-3616
Fax: (214) 665-3601
klaudtd@gtlaw.com
hopkinsjm@gtlaw.com

Matthew J Cannon
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
312-456-8400
cannonm@gtlaw.com

ATTORNEYS FOR JPMORGAN CHASE
BANK

/s/ Gregory C. Cook
Gregory C. Cook
State Bar No. 24084974
Steve Corhern
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
(205) 251-8100
Fax: (205) 226-8799
gcook@balch.com

Michael A. Logan
State Bar No. 12497500
C. Jeffrey Novel
State Bar No. 24037198
Kane Russell Coleman Logan, PC
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
(214) 777-4200
Fax: (214) 777-4299
mlogan@krcl.com
jnovel@krcl.com

ATTORNEYS FOR COMPASS BANK

/s/ William P. Huttenbach
William P Huttenbach
State Bar No. 24002330
Joseph R Anderson
State Bar No. 24054578
Hirsch & Westheimer PC
1415 Louisiana, 36th Floor
Houston, TX 77002
(713) 220-9184
Fax: 713-223-9319
phuttenbach@hirschwest.com

ATTORNEYS FOR THE AMERICAN
NATIONAL BANK OF TEXAS

/s/ Michael J. Bronson
Michael J. Bronson
Laurie A. Witek
Dinsmore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, OH 45202
(513) 977-8200
Fax: (513) 977-8141
michael.bronson@dinsmore.com
laurie.witek@dinsmore.com

Anthony J. Campiti
State Bar No. 00798092
Thompson & Knight LLP
1722 Routh St., Suite 1500
Dallas, TX 75201-2533
(214) 969-1700
Fax: (214) 969-1751
tony.campiti@tklaw.com

ATTORNEYS FOR FIFTH THIRD
BANK

/s/ Kenneth E. Broughton, Jr.
Kenneth E Broughton , Jr
State Bar No. 03087250
Michael H. Bernick
State Bar No. 24078227
Reed Smith LLP
811 Main Street , Suite 1700
Houston, TX 77002
(713) 469-3819
Fax: (713) 469-3899
kbroughton@reedsmith.com
mbernick@reedsmith.com

Roy W. Arnold
Reed Smith LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3916
rarnold@reedsmith.com

ATTORNEYS FOR MANUFACTURERS
AND TRADERS TRUST COMPANY

/s/ M. Chad Berry
Stacy B. Loftin
State Bar No. 12489500
M. Chad Berry
State Bar No. 24001730
Adams, Lynch & Loftin, P.C.
3950 Highway 360
Grapevine, Texas  76051-6741
(817) 552-7742
Fax: (817) 328-2942
sbl@all-lawfirm.com
cberry@all-lawfirm.com

ATTORNEYS FOR FROST BANK

/s/ Thomas B. Walsh, IV
Thomas B. Walsh, IV
State Bar No. 00785173
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX  75201
(214) 453-6460
Fax: (214) 453-6400
twalsh@winston.com

ATTORNEYS FOR BANK OF AMERICA,
N.A., COMERICA BANK, PNC BANK N.A.

24

/s/ Joseph B. VanFleet
Joseph B. VanFleet
Timothy D Gronewold
Howard & Howard Attorneys PLLC
211 Fulton Street, Suite 600
Peoria, IL 61602
(309) 672-1483
Fax: 309-672-1568
jvanfleet@howardandhoward.com
tgronewold@howardandhoward.com

Brian J Hurst
State Bar No. 10313300
Nicholas O Kennedy
Baker & McKenzie, LLP
2300 Trammell Crow Center
2001 Ross Ave
Dallas, TX 75201
(214) 978-3075
Fax: 214/978-3099
brian.hurst@bakermckenzie.com


ATTORNEYS FOR CENTRUE BANK

/s/ Michael S. Smiley
Michael S Smiley
State Bar No. 18526550
Christopher Jason Fenton
State Bar No. 24087505
Underwood Law Firm, P.C.
PO Box 9158
Amarillo, TX 79105-9158
(806) 376-5613
Fax: (806) 349-9470
mike.smiley@uwlaw.com
jason.fenton@uwlaw.com

Cara Doak Kennemer
State Bar No. 24036489
Underwood Law Firm, P.C.
1008 Macon Street, Suite 101
Fort Worth, TX 76102
(817) 885-7529
Fax: (817) 977-0880
cara.kennemer@uwlaw.com

ATTORNEYS FOR AMARILLO NATIONAL
BANK

/s/ Craig C. Martin
Craig C. Martin
Illinois Bar No. 6201581
Michele L. Slachetka
Illinois Bar No. 6297640
Jenner & Block LLP
353 N. Clark Street
Chicago, IL  60654-3456
(312) 222-9350
Fax:  (312) 527-0484
cmartin@jenner.com
mslachetka@jenner.com

/s/ Ronald W. Breaux
Ronald W Breaux
State Bar No. 02937200
Haynes and Boone, LLP
2323 Victory Ave, Suite 700
Dallas, TX 75219-7673
(214) 651-5688
Fax: (214) 651-5940
ron.breaux@haynesboone.com

ATTORNEYS FOR THE NORTHERN
TRUST COMPANY

/s/ Daniel P. Callahan
Daniel P Callahan
State Bar No. 03648700
Kessler Collins
2100 Ross Ave, Suite 750
Dallas, TX 75201
(214) 379-0722
Fax: (214) 373-4714 FAX
dpc@kesslercollins.com

William Scott Turnbull
Crary Buchanan PA
759 SW Federal Highway, Suite 106
Stuart, FL 34994
(772) 287-2600
Fax: 772-223-4360
Turnbull@crarybuchanan.com

ATTORNEYS FOR SEACOST NATIONAL
BANK

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served a copy of the foregoing on all counsel of record via the Courts'

CM/ECF system on December 20, 2017.

/s/ Jason M. Hopkins
Jason M. Hopkins
