# United States District Court

## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex* | § | |
| *rel.* EDWARD HENDRICKSON | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-0292-S |
| | § | |
| | § | |
| BANK OF AMERICA, N.A., et al. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants'[1] Motion to Dismiss [ECF No. 92]. For the reasons

below, the Motion is granted in part and denied in part.

## I.  BACKGROUND

### A.  *The Federal Benefit Payment System*

This *qui tam* action arises out of alleged violations of the False Claims Act ("FCA") by

sixteen banks that process benefit payments for the recipients of federal benefits. Certain federal

entitlement programs contemplate lifetime benefit payments. Am. Compl. ¶ 15. These include

programs administered by the Social Security Administration ("SSA"), the Office of Personnel

Management ("OPM"), the Railroad Retirement Board ("RRB"), and the Department of Veterans

Affairs ("VA"). *Id.* The recurring benefit payments from these agencies are intended to cease

---

[1] The defendants in this case are Bank of America, N.A., Wells Fargo Bank, N.A., Citibank, N.A., Comerica Bank, Wells Fargo Bank, N.A., JP Morgan Chase Bank, N.A., Manufacturers and Traders Trust Company, Seacost National Bank, Fifth Third Bank, PNC Bank, N.A., The Northern Trust Company, Frost Bank, The American National Bank of Texas, Centrue Bank, Amarillo National Bank, and Wachovia Bank, N.A. Relator Edward Hendrickson, with the consent of the United States, voluntarily dismissed Defendant Compass Bank on May 21, 2018. *See* ECF Nos. 124, 125, 128.

once the person receiving the payments (the "Recipient")[2] dies. *Id.* Relator Edward Hendrickson ("Relator") alleges that, due to fraud by Defendants, the payments often continue long after the Recipient has died and that a large percentage of the overpayments are never returned to the Government.

The process by which federal agencies make recurring benefit payments entails several steps. First, the agencies transmit the funds to the Automated Clearing House ("ACH") network. Am. Compl. ¶ 19. The bank where the Recipient has an account receives the funds from the ACH network and then deposits the payment into the Recipient's account. *Id.* ¶ 20. The banks participating in the ACH network are referred to as "Receiving Depository Financial Institutions" ("RDFI"). *Id.* ¶ 23. All of the banks named as defendants in the instant case are RDFIs. When an RDFI accepts a benefit payment, it agrees to be bound by applicable Department of Treasury ("Treasury") rules and regulations. *Id.* ¶ 21. The main sources of such regulations are 31 C.F.R. Part 210 ("Part 210") and the "instructions and procedures" issued under Part 210, including the Treasury Financial Manual and the Green Book. 31 C.F.R. § 210.3(c); *see also* Am. Compl. ¶ 27. Every time a bank accepts a deposit, it renews its contractual promise to abide by Treasury rules and regulations. *See* Bureau of the Fiscal Serv., Green Book 5-3 (2016), https://www.fiscal.treasury.gov/ fsreports/ref/greenBook/downloads.htm. [hereinafter Green Book]; Am. Compl. ¶ 28. According to Relator, RDFIs are intended to act as "gatekeepers" and ensure that the payments they receive are authorized. Am. Compl. ¶ 29.

Relator posits that RDFIs typically learn of Recipients' deaths when they receive Death Notification Entries ("DNEs"). *Id.* ¶ 32. A DNE informs an RDFI that a Recipient has died. *Id.*

---

[2] The governing regulations define "Recipient" as "a natural person . . . that is authorized to receive a Federal payment from an agency." 31 C.F.R. § 210.2(o). A "Beneficiary" is "a natural person other than a recipient who is entitled to receive the benefit of all or part of a benefit payment." *Id.* § 210.2(g).

¶ 33. Only federal agencies can originate DNEs. *Id.* ¶ 32 (quoting Green Book 4-2). The SSA, OPM, and RRB all issue DNEs. *Id.* ¶ 34. In Relator's view, pursuant to the Green Book, RDFIs are obligated to stop accepting benefit payments and are "encouraged" to "flag" the deceased Recipient's account once they receive a DNE. *Id.* ¶¶ 36-37 (citing and quoting Green Book 5-8, 4-2). Pursuant to 31 C.F.R. § 210.10(a), "An RDFI shall be liable to the Federal Government for the total amount of all benefit payments received after the death . . . of a [R]ecipient . . . unless the RDFI has the right to limit its liability under [31 C.F.R. § 210.11]."

When the Government finds out that a payment was made to a deceased Recipient, it can issue a Notice of Reclamation ("NOR") to the appropriate RDFI. Am. Compl. ¶ 55. Upon receiving the NOR, the RDFI can limit its liability by certifying, on the NOR, the date it learned of the Recipient's death. *Id.* ¶ 56. The RDFI is only required to return payments received after it became aware of the death. *Id.* ¶ 58.

## B. *Relator's Allegations*

Relator alleges that Defendants routinely violated the FCA by ignoring DNEs and falsely certifying on NORs that they had learned of Recipients' deaths after receiving DNEs. *Id.* ¶ 59. Relator learned of this alleged fraud while working as an investigator in the Office of the Inspector General ("OIG") for the VA from 1996 to 2016. *Id.* ¶ 60. In this role, Relator was responsible for investigating and attempting to recoup recurring benefit payments made by the VA after Recipients had died. *Id.* Relator alleges that, in the course of performing this investigatory function, he requested and reviewed NORs submitted by Defendants. *Id.* ¶ 64. While performing this review, Relator contends that he uncovered "numerous instances" of Defendants falsely certifying the date on which they learned of Recipients' deaths. *Id.* This alleged misconduct harmed federal agencies by depriving them of taxpayer money to which they were entitled and by forcing them to incur the

3

costs associated with attempting to recover unauthorized payments from third parties who withdrew funds from deceased Recipients' accounts. *Id.* ¶ 65.

Relator filed this case under the *qui tam* provisions of the FCA on February 2, 2016. On March 30, 2017, the United States notified the Court that it declined to intervene in the case. *See* Notice of Declination [ECF No. 11]. Relator filed his Amended Complaint on July 20, 2017. The Amended Complaint contains two causes of action. In Count I, Relator alleges a violation of 31 U.S.C. § 3729(a)(1)(B), the false record provision of the FCA. In Count II, Relator alleges a violation of 31 U.S.C. § 3729(a)(1)(G), the reverse false claims provision of the FCA.[3] On October 30, 2017, Defendants moved to dismiss the Amended Complaint in its entirety.[4] The Court heard oral argument on the Motion to Dismiss on May 10, 2018. With permission from the Court, the parties completed supplemental briefing on June 29, 2018.

### C.    *The Reverse False Claims Act*

A reverse false claim consists of "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government

---

[3] On June 26, 2018, Relator voluntarily dismissed Count I. *See* ECF No. 133. Thus, only his reverse false claims cause of action remains before the Court.

[4] Pursuant to Special Order 3-318, this case was transferred from the docket of Chief Judge Barbara M.G. Lynn to the docket of this Court on March 8, 2018.

when a payment is obligated." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

## II.    DISCUSSION

### A.    *Standing*

Under the Constitution, a federal court may decide only actual cases or controversies. U.S. CONST. art. III, § 2.  A court properly dismisses a case where it lacks the constitutional power to decide it. *See Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  Dismissal for lack of subject-matter jurisdiction is warranted when "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).  "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161 (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

Standing is a component of subject-matter jurisdiction that is properly raised by a motion to dismiss under Rule 12(b)(1). *See Hollis v. Lynch*, 121 F. Supp. 3d 617, 626 (N.D. Tex. 2015) ("[W]hether a party has proper standing is a question of subject matter jurisdiction." (citing *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006))).  The requirement that a litigant must have standing "to invoke the power of a federal court is perhaps the most important of [the case-or-controversy] doctrines." *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).  To establish standing, a plaintiff must demonstrate that (1) he or she has suffered an injury in fact that is both

concrete and imminent; (2) there is a "causal connection between the injury and the conduct complained of"; and (3) the injury is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). Defendants claim that Relator is unable to establish the redressability element required for Article III standing due to preemption and assignment of damages to the Federal Reserve Banks. The Court will address each argument in turn.

### i. *Preemption*

First, Defendants argue that Relator lacks standing because Part 210 provides the exclusive remedy for liability arising out of benefit payments over the ACH network. *See* 31 C.F.R. § 210.3(a) ("The rights and obligations of the United States and the Federal Reserve Banks with respect to all Government entries . . . are governed by this part . . . ."). Defendants contend that Part 210 contains the exclusive remedy for recovery of benefits paid to deceased recipients, limits financial institutions' liability to the amount of credit entries transmitted to them,[5] and sets the amount for which an RDFI can be liable in connection with the reclamation process. Because this comprehensive regulatory scheme exists, Defendants argue, "Relator's attempt to insert himself and his purported FCA claims into the well-developed body of laws regulating the ACH system and the nation's commercial banks" is inappropriate. Defs.' Br. 11 [ECF No. 95]; *see also, e.g., United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1222 (10th Cir. 2008) (When the statute creates "a complex monitoring and remedial scheme . . . [it would] be curious to read the FCA . . . to undermine the government's own regulatory procedures.").

However, Defendants' argument contravenes "well-established law that strongly disfavors preclusion of one federal statute by another absent express manifestations of preclusive intent."

---

[5] Because of this provision, Defendants argue that subjecting them to treble damages and penalties is inconsistent with Part 210, which limits damages to the amount of actual loss.

*United States v. Sforza*, 326 F.3d 107, 111 (2d Cir. 2003) (citing *United States v. Gen. Dynamics Corp.*, 19 F.3d 770, 774 (2d Cir. 1994)). Indeed, "when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Within the context of the FCA specifically, courts have been "reluctant to find pre-emption[,] . . . even where other laws provide closely related regulation and remedies." *United States ex rel. Fallon v. Accudyne Corp.*, 880 F. Supp. 636, 639 (W.D. Wis. 1995) (discussing Second Circuit's holdings in *General Dynamics Corp.*, 19 F.3d 770, and *United States v. Foster Wheeler Corp.*, 447 F.2d 100 (2d Cir. 1971)).

This Court declines to deviate from the aforementioned legal principles in the instant case. Neither the text of Part 210 nor its legislative history contains an "express manifestation[] of preclusive intent." *Sforza*, 326 F.3d at 111. If Congress desired to preclude the FCA's operation in this context, it could have done so, and it has done so in the past. When Congress desired to prohibit FCA actions based upon fraudulent federal income tax filings (because such fraud is addressed and remedied by the Internal Revenue Code), it added subsection (d) to 31 U.S.C. § 3729.[6] However, "Congress did not extend such an exclusion to . . . claims which provide remedies for proscribed conduct other than fraud on the government." *Fallon*, 880 F. Supp. at 639. Further, for the reasons discussed below, no "positive repugnancy" between Part 210 and the FCA prevents the Court from giving effect to both statutes. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363 (1842)).

The cases cited by Defendants in support of their argument do not stand for the proposition that the existence of a comprehensive regulatory scheme displaces the FCA, but rather that mere regulatory violations with nothing more are insufficient to support a finding that the FCA has been

---

[6] 31 U.S.C. § 3729(d) states that the FCA "does not apply to claims, records, or statements made under the Internal Revenue Code of 1986."

violated. *See, e.g., Conner*, 543 F.3d at 1221 ("There is thus no basis . . . to adopt an express false certification theory that turns *every* violation of a Medicare regulation into the subject of an FCA qui tam lawsuit."); *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 795-96 (8th Cir. 2011), *superseded on other grounds by statute*, Fraud Enforcement and Recovery Act of 2009, 31 U.S.C. § 3729(a)(1)(B) ("The FCA is not concerned with regulatory noncompliance. Rather, it serves a more specific function, protecting the federal fisc by imposing severe penalties on those whose false or fraudulent claims cause the government to pay money."). In the instant case, Relator alleges affirmative fraud rather than a simple regulatory violation, so the cases cited by Defendants are distinguishable.

Moreover, the cases cited by Relator support the notion that the FCA and Part 210 can coexist. First, each provides for different remedies. *See Fallon*, 880 F. Supp. at 639 (finding FCA not preempted by environmental statutes, in part, because suit under federal environmental statutes could not "obtain fraud damages or statutory penalties for defrauding the government."). Second, those remedies complement each other, as the FCA allows for deterrence penalties not contained in Part 210. *See Sforza*, 326 F.3d at 113-14. Part 210 does not address—much less provide remedies for—fraud. *See Gen. Dynamics Corp.*, 19 F.3d at 774-75 ("It would be anomalous to conclude that legislation thus animated was intended by Congress to weaken or preclude the availability of other federal remedies in areas that the [Anti-Kickback Act] concededly did not address."). Third, the FCA and Part 210 cover different actions. The FCA applies specifically to

"false, fictitious, or fraudulent" claims—not merely inaccurate ones. *Foster Wheeler Corp.*, 447 F.2d at 101.

Because the FCA and Part 210 provide different remedies for different conduct, and because of the strong presumption against preemption, the Court denies Defendants' Motion to Dismiss the Amended Complaint on this ground.

### ii.    *Assignment*

Second, Defendants argue that Relator lacks standing because he is not an assignee of the claim for damages. "[T]he Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). In cases involving a relator, the relator has standing only because the FCA effects a partial assignment of the Government's damages claim. *See id.* at 773. Defendants argue that, in this case, any claim for damages has already been assigned to the Federal Reserve Banks (non-governmental entities) for collection. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 283 (2008) ("[A]ssignees for collection only can properly bring suit."). Defendants base their argument on Subpart B of Part 210:

> If an RDFI does not return the full amount of the outstanding total or any other amount for which the RDFI is liable under this subpart in a timely manner, the Federal Government will collect the amount outstanding by instructing the appropriate Federal Reserve Bank to debit the account utilized by the RDFI.

31 C.F.R. § 210.10(e).

Defendants argue that the Federal Reserve Banks' ability to debit the account constitutes an assignment for collection by the Government. Thus, Defendants conclude, the Government cannot re-assign the same right to Relator for purposes of the FCA. *See Salem Tr. Co. v. Mfrs.'*

9

*Fin. Co.*, 264 U.S. 182, 197 (1924) ("A subsequent assignee takes nothing by his assignment, because the assignor has nothing to give." (citation omitted)).

The Court disagrees with Defendants. The alleged injury in fact that confers standing on Relator is fraud, which, as discussed above, is not addressed in Part 210. *See Sprint Commc'ns*, 554 U.S. at 286 ("[T]he False Claims Act . . . authorizes a private party to bring suit to remedy an injury (fraud) that the United States, not the private party, suffered."). "[T]he United States' injury in fact suffices to confer standing on" a relator. *Stevens*, 529 U.S. at 774. The damages flowing from that injury (fraud) are not assigned to the Federal Reserve Banks under Part 210, but rather to Relator under the FCA. *See id.* at 773 ("The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim.").

Even if Part 210 were somehow implicated, the mere ability to instruct a Federal Reserve Bank to collect the Government's damages does not cause legal title to those damages to vest in the Federal Reserve Bank. In *Sprint Commc'ns*, the Supreme Court of the United States repeated that the assignee's possession of legal title to the claim gave rise to standing. *See* 554 U.S. at 283 (reviewing Supreme Court precedent allowing suits by assignees possessing legal title). Nothing in Subpart B expressly vests the Federal Reserve Banks with legal title. *See id.* at 286 (emphasizing importance of contractual language assigning "all rights, title and interest" to assignee (quoting App. to Pet. for Cert. 114)). If the Federal Reserve Banks do not have legal title to the damages, then the Government retains the right to assign a portion of those damages to Relator.

In sum, the Court rejects Defendants' theory, which would render relators unable to bring FCA actions based on conduct governed by Part 210. If the Government had already assigned to the Federal Reserve Banks its right to collect damages for *any* failure by an RDFI to return funds,

the Government would lose the right to rely on a *qui tam* suit to remedy fraud perpetrated by an RDFI. *Qui tam* suits must be brought by private citizens, and the Federal Reserve Banks clearly are not private citizens. *See* 31 U.S.C. § 3730(b). The Court declines to adopt a reading of Part 210 that would have such an effect on *qui tam* litigation. For all of the foregoing reasons, the Court finds that Relator has standing to bring the instant lawsuit and denies Defendants' Rule 12(b)(1) Motion to Dismiss.

## B.  *Public Disclosure*

Defendants claim that sixteen sources constitute public disclosures that bar Relator's lawsuit. The FCA sets forth criteria for public disclosures. Two versions of the public-disclosure bar apply to the claims at issue in this case because of statutory amendments that took effect in 2010. For claims arising prior to March 23, 2010, the bar is as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (1986). On March 23, 2010, the Patient Protection and Affordable Care Act amended the bar to read:

> The court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010). The Fifth Circuit applies the 1986 version to allegations based on conduct that occurred prior to March 23, 2010, and applies the 2010 version to allegations based

on conduct occurring on or after that date. *See United States ex rel. Lockey v. City of Dallas*, 576 F. App'x 431, 435, 437 (5th Cir. 2014).

There are several differences between the two versions, none of which alter the outcome of this Court's analysis. First, the bar no longer contains jurisdictional language; instead it requires a court to dismiss barred actions. This is a difference without a distinction in the instant case. Prior to the 2010 amendments, courts viewed a jurisdictional challenge under the FCA as "the equivalent of a motion for summary judgment because it [was] necessarily intertwined with the merits." *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 143 (5th Cir. 2017). It is unclear whether the 2010 version of the public-disclosure bar is still a jurisdictional barrier or whether it is now an affirmative defense. If it is an affirmative defense, it would require Defendants to "establish beyond peradventure *all* of the essential elements of the defense." *United States ex rel. Lockey v. City of Dallas*, Civ. A. No. 3:11-cv-354-O, 2013 WL 268371, at *5 (N.D. Tex. Jan. 23, 2013) (citation omitted). The Fifth Circuit has yet to address this issue. But, even if the amendments contemplated converting the jurisdictional inquiry into an affirmative defense, the ultimate outcome remains the same—if there has been a disqualifying public disclosure, the lawsuit will be dismissed. *See Lockey*, 2013 WL 268371, at *13 ("Even with this change in statutory language, because this jurisdictional threshold must be resolved preliminarily, the Court's analysis, as a practical matter, remains the same." (citing *United States ex rel. Osheroff v. Humana, Inc.*, No. 10-24486-cv-SCOLA, 2012 WL 4479072, at *4 (S.D. Fla. Sept. 28, 2012))).

The Court would reach the same conclusion in the instant case regardless. If the Court required Defendants to carry the affirmative defense burden of proof, Defendants would still prevail, and the public-disclosure bar would prohibit Relator from moving forward with his

lawsuit.[7] Thus, the Court need not, and declines to, decide whether the 2010 amendment changes the public-disclosure bar from a jurisdictional inquiry to an affirmative defense.

Second, the action no longer is required to be "based upon" publicly disclosed transactions—it must instead be "substantially the same." This change has no real impact, as courts considering the term "based upon" interpreted it to mean "substantially the same." *See, e.g., Lockey*, 2013 WL 268371, at \*13-\*14 (noting that inquiry under 2010 version "essentially remains the same" as inquiry under 1986 version); *see also Osheroff*, 2012 WL 4479072, at \*10 (declining to "labor unnecessarily to draw narrow distinctions, to the extent there are any, between [the two] standards" in case that did not present close call). Third, state court hearings are no longer considered sources of public disclosures. This change only disqualifies one of Defendants' proffered disclosures, as noted below.

Finally, the definition of "original source" differs between the two versions. Under the 1986 version, an original source is someone "who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (1986). Under the 2010 version, an original source is someone "who either (i) prior to a public disclosure . . . , has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [sic] who has knowledge that is

---

[7] If the bar is an affirmative defense, "the Court may convert a motion to dismiss that asserts this affirmative defense into a motion for summary judgment provided the Court 'abides by the procedural safeguards of Rule 56.'" *Lockey*, 2013 WL 268371, at \*5 n.3 (quoting *Capital Films Corp. v. Charles Fries Prods., Inc.*, 628 F.2d 387, 390-91 n.1 (5th Cir. 1980)). When parties submit evidence outside the pleadings at the motion to dismiss stage, they are on notice that the Court could convert the motion into a motion for summary judgment. *Id.* Here, the Court can properly convert the Motion to Dismiss into a motion for summary judgment because Defendants submitted evidence outside of the pleadings in their briefing, Relator had multiple opportunities over the course of approximately six months to respond and present summary judgment evidence, and Relator himself asserted that using the summary judgment standard is proper. *Id.; see also* Relator's ("Rel.") Mem. in Opp'n 9 [ECF No. 106]. Defendants also noted that the Court "may elect to treat this motion as . . . a motion for summary judgment." Defs.' Br. 21 n.9 [ECF No. 93].

independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B) (2010).

The Fifth Circuit employs an overarching, three-part test to guide the analysis of whether the public-disclosure bar applies: "1) whether there has been a 'public disclosure' of allegations or transactions, 2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011) (quoting *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995)). The publicly disclosed allegations or transactions "need only be as broad and as detailed as those in the relator's complaint." *Id.* To allocate the burden of proof, courts use a burden-shifting approach in which defendants must first identify public disclosures "plausibly containing allegations or transactions on which [the relator's] complaint is based." *Id.* Then, the burden shifts to the relator to show that there is a genuine issue of material fact as to whether his action was "based on" such disclosures. *Id.* Because the differences in the inquiries under the 1986 bar and the 2010 bar are minimal, the following analysis applies to both pre- and post-March 23, 2010, conduct, except where otherwise noted.

i.    *Original vs. Amended Complaint*

As an initial matter, the Court must consider whether its jurisdictional analysis should proceed under the original or amended version of the complaint. Some courts have analyzed only the original complaint in determining whether jurisdiction exists under the 1986 version of the public-disclosure bar. *See, e.g., Jamison*, 649 F.3d at 328 (holding that when original "complaint did not establish jurisdiction, it should have been dismissed; [the relator's] amendments cannot

save it"). However, in the instant case, Defendants have directed their jurisdictional arguments to the Amended Complaint. *See* Defs.' Br. 24 n.11 [ECF No. 93]. The Court finds that nothing precludes its ability to consider the argument that "this Court lacks jurisdiction, regardless of whether the original Complaint fails to provide a basis for jurisdiction in the first instance." *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 514 (N.D. Tex. 2012). Thus, this Court will focus only on the Amended Complaint in analyzing whether it has jurisdiction under the 1986 version of the public-disclosure bar.

### ii.   *Public Disclosure of Allegations or Transactions*

The first issue for this Court to consider is whether there was a public disclosure of the allegations or transactions at issue that predated the filing of Relator's complaint. Courts look for three required elements: "(1) public disclosure; (2) in a particular form specified in the statute; and (3) of allegations or transactions." *Colquitt*, 864 F. Supp. 2d at 517. The Court will consider the first two elements here. The Court will then consider the last element in conjunction with its "based upon" inquiry below. *See Jamison*, 649 F.3d at 327 ("[C]ombining the first two steps can be useful, because it allows the scope of the relator's action in step two to define the 'allegations or transactions' that must be publicly disclosed in step one.").

Defendants identify a litany of public disclosures that they contend are in the form specified by the FCA, including state and federal court cases, government administrative reports, and news articles. As both parties agree, the state court case cited by Defendants, *Derryberry v. NationsBank of Tex., N.A.*,[8] only constitutes a public disclosure for purposes of the 1986 version of the public-disclosure bar.

---

[8] No. 01-95-01438-CV, 1998 WL 93275 (Tex. App.—Houston [1st Dist.] Mar. 5, 1998, pet. denied), *cert. denied*, 525 U.S. 1121 (1999).

Relator contests Defendants' assertion that the 1987 Banking Circular,[9] the Green Book,[10] and the SSA Programs Operations Manual System ("POMS")[11] constitute public disclosures. *See* Defs.' App. Exs. G, K-M. Defendants argue that these sources are "administrative reports" and thus constitute public disclosures. Defs.' Reply 13. "[T]o be an administrative report within the meaning of the FCA, a document must (1) constitute official government action and (2) provide information." *Colquitt*, 864 F. Supp. 2d at 518. The threshold for the "official government action" element is low; all that is required under *Colquitt* is that the government release the information in question. *Id.* Here, as in *Colquitt*, all three sources are published by government agencies—the Office of the Comptroller of the Currency, Treasury, and the SSA, respectively. And, all three provide information. Thus, the Court finds that all of Defendants' proffered sources constitute public disclosures.

### iii. *"Based Upon"*

Next, the Court must determine whether Relator's complaint is "based upon" (or substantially similar to) any of the public disclosures identified by Defendants. Because the Court combined the first and second steps, the essential question for the Court is now "whether the scope of Relators' action is similar to the allegations or transactions that are publicly disclosed." *Lockey*, 2013 WL 268371, at *14. A complaint is based upon public disclosures where "one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the . . . scheme[.]" *Jamison*, 649 F.3d at 331. The public disclosures must "'provide[] specific details about the fraudulent scheme and the types of actors involved in it' sufficient to 'set the

---

[9] OFFICE OF THE COMPTROLLER OF THE CURRENCY, FEDERAL RECURRING PAYMENTS THROUGH FINANCIAL INSTITUTIONS BY MEANS OTHER THAN BY CHECK (1987).
[10] Green Book chs. 4-5.
[11] SOC. SEC. ADMIN., SOCIAL SECURITY ADMINISTRATION PROGRAM OPERATIONS MANUAL SYSTEM GN 02408.605, http://secure.ssa.gov/poms.nsf/lnx/0202408605.

government on the trail of the fraud' and ensure that the government will not 'need to comb through myriad transactions performed by various types of entities in search of potential fraud.'" *Id.* at 329 (quoting *In re Nat. Gas Royalties*, 562 F.3d 1032, 1042-43 (10th Cir. 2009)). However, "the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint." *Id.* at 327.

The Fifth Circuit has adopted the *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*[12] test "for determining whether public disclosures contain sufficient indicia of an FCA violation to bar a subsequently filed FCA complaint." *Solomon*, 878 F.3d at 144. To find a public disclosure under this test, the Court must find both the misrepresented state of facts ("X") and the true state of facts ("Y") that together give rise to an inference of fraud ("Z"). *Springfield*, 14 F.3d at 653-55. "The presence of [X] or [Y] in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud." *Id.* at 655.

"An irreducible minimum is that the disclosures furnish evidence of the fraudulent scheme alleged." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012). In the instant case, the fraudulent scheme alleged is "that each individual Defendant Bank has knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the government by failing to return government payments of money the Banks received for deceased beneficiaries that the Banks knew to be dead." Rel.'s Consol. Reply Br. 26 [ECF No. 136] (citing Am. Compl. ¶¶ 19-23, 29, 32-33, 35-39, 44, 52-53, 81-87).

Relator argues that none of the sources cited by Defendants disclosed the particular scheme alleged in his complaint. "By blaming the Government (and others)," Relator argues, "the Banks are actually highlighting the truth that they have no 'public disclosure' of misconduct by *the*

---

[12] 14 F.3d 645 (D.C. Cir. 1994).

17

*financial industry.*" Rel.'s Mem. in Opp'n at 6-7 [ECF No. 106]. The Court disagrees. Certain

of the disclosures cited by Defendants, when considered collectively,[13] publicly disclose the

allegations or transactions alleged by Relator, and the Court finds that Relator's Amended

Complaint is based upon these disclosures.

### a.    *Sources That Are not Public Disclosures*

Two of the documents identified by Defendants—the Green Book and the SSA POMS—

do no more than "merely restate the law applicable to" RDFIs and thus do not publicly disclose

the fraudulent scheme alleged by Relator. *Jamison*, 649 F.3d at 329. Thus, the Court has not

considered these sources in conducting its analysis.

The 2015 SSA Audit, 2015 O'Carroll Statement, 2011 OPM Audit, VA OIG Report, and

the news articles fail to implicate banks at all, instead identifying agencies' and/or individuals'

actions or omissions as the causes of improper overpayments. Thus, while these sources might

"set the [G]overnment on the trail of fraud," they do not set the Government on the trail of fraud

by financial institutions. *Jamison*, 649 F.3d at 329 (internal quotation and citation omitted). The

Court has not considered these sources in conducting its analysis but, for the sake of clarity, will

briefly discuss them.

The 2015 SSA Audit,[14] for example, identifies issues with the SSA's procedure for

determining whether suspended Recipients had died. *See* Defs.' App. Ex. H, at 41. The audit

concluded that "SSA did not effectively recover direct deposit payments to bank accounts after

beneficiaries' deaths because the [SSA] did not always determine when suspended beneficiaries

---

[13] To satisfy their burden, Defendants need not produce a single document, standing alone, that constitutes a disqualifying public disclosure. *See United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 944 (8th Cir. 2017) ("[W]e consider 'public disclosures contained in different sources' as a whole to determine whether they collectively 'provide information that leads to a conclusion of fraud.'" (quoting *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 390 (6th Cir. 2005))).

[14] Soc. Sec. Admin., Office of the Inspector Gen., Audit Report: Payments Deposited into Bank Accounts After Beneficiaries Are Deceased (2015), https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-02-13-13052.pdf.

had died." Defs.' App. Ex. H, at 46. Similarly, the 1990 General Accounting Office Report[15] identifies the VA's inability to obtain the SSA's death information and certain Recipients' lack of Social Security numbers as the driving force behind the VA's payments to deceased Recipients. *See* Defs.' App. Ex. N, at 147-48.

The 2015 O'Carroll Statement[16] suffers from the same defects. It identifies "fraud, . . . poor understanding of reporting responsibilities or inability to report, administrative errors, and other reasons" as the causes of improper payments. Defs.' App. Ex. Q, at 203. Although this statement does identify fraud as a cause of overpayments, it clarifies that the fraud identified is perpetrated by "individuals who have concealed a family member's or other person's death to collect the deceased's Social Security benefits." *See id.* at 206. The 2010 VA Report[17] identifies causes of overpayments and identifies VA programs that are susceptible to significant improper payments. Defs.' App. Ex. J, at 84. The report does not mention banks and does not distinguish between overpayments caused by "a beneficiary d[ying] too late in the month to stop the release of the payment" and those caused by the VA not being "timely notified of the death of a beneficiary." *Id.*

The 2011 OPM Audit[18] also does not indicate any wrongdoing on the part of banks. The only substantive mention of banks' role in the benefit payment process comes in a section discussing OPM establishing working relationships with Defendant Wells Fargo and Defendant

---

[15] GEN. ACCOUNTING OFFICE, VETERANS' BENEFITS: VA NEEDS DEATH INFORMATION FROM SOCIAL SECURITY TO AVOID ERRONEOUS PAYMENTS (1990), http://www.gao.gov/assets/220/212819.pdf.

[16] PATRICK O'CARROLL, JR., INSPECTOR GEN., SOC. SEC. ADMIN., EXAMINING FEDERAL IMPROPER PAYMENTS AND ERRORS IN THE DEATH MASTER FILE (2015), https://oig.ssa.gov/sites/default/files/testimony/O%27Carroll%20HSGAC%20March%2016%20Written%20Statement%20FINAL.pdf.

[17] DEP'T OF VETERANS AFFAIRS, EXECUTIVE ORDER 13520 – REDUCING IMPROPER PAYMENT, FY 2010 FIRST QUARTER HIGH-DOLLAR OVERPAYMENTS REPORT (2010), https://www.va.gov/ABOUT_VA/docs/2010_high_dollar_overpayment_reportQ1.pdf.

[18] U.S. OFFICE OF PERSONNEL MGMT., OFFICE OF THE INSPECTOR GEN., STOPPING IMPROPER PAYMENTS TO DECEASED ANNUITANTS (2011), https://www.opm.gov/our-inspector-general/office-of-legal-and-legislative-affairs/stopping-improper-payments-to-deceased-annuitants.pdf.

Bank of America "to uncover inactive annuitant accounts, as well as explore ways to proactively recover improper payments that have been escheated to the States." Defs.' App. Ex. O, at 175. Rather than suggest wrongdoing by these banks, the audit notes that "Wells Fargo was not able to verify if the account holders were deceased." *Id.*

Defendants rely heavily on the VA OIG Report,[19] as it discloses one of the examples Relator proffers in his complaint. *See* Defs.' App. Ex. I, at 76-77. However, the short summary of this instance places the blame for any fraud squarely on the deceased Recipient's daughter. *See id.* at 77 ("The daughter of a deceased VA beneficiary pled guilty to theft of Government funds.").

Finally, the Washington Post Article[20] and the Government Executive Article[21] both identify "mistakes the government makes," rather than fraud by banks, as the culprit for payments being made to deceased Recipients. Defs.' App. Ex. R, at 209; *see also* Defs.' App. Ex. S, at 214 (citing report from SSA Inspector General "that found that more than 180,000 deceased individuals had not been added to the Death Master File, even though these same individuals had been reported as deceased to the SSA Supplemental Security Records.").

b.    *Sources That Are Public Disclosures*

The Court finds that Relator's Amended Complaint is based upon public disclosures in the six remaining sources. In *Thomas v. Sec. of HHS*, three widows challenged the procedure by which the Government recovers inaccurate social security direct deposit payments. No. C 81-2485 SW, 1983 WL 44285, at *1 (N.D. Cal. Sept. 14, 1983). All three plaintiffs' stories were similar. In each instance, the SSA learned that the Recipient had died, yet that agency continued to certify

---

[19] DEP'T OF VETERANS AFFAIRS, OFFICE OF THE INSPECTOR GEN., APRIL 2015 HIGHLIGHTS (2015), https://www.va.gov/oig/pubs/highlights/VAOIG-highlights-201504.pdf.
[20] David Fahrenthold, *Agencies Can't Always Tell Who's Dead and Who's Not, So Benefit Checks Keep Coming*, WASH. POST, Nov. 3, 2013.
[21] Charles S. Clark, *Push to Curb Payments to Dead Beneficiaries Intensifies*, GOV. EXEC., May 8, 2013.

payments of benefits to him. *Id.* Each widow closed the joint account that she had shared with the Recipient, opened a new account in her name, and "executed *with the bank* a form authorizing the Treasury Department to deposit her benefits directly into her account." *Id.* (emphasis added). Despite these actions, the bank credited the deceased Recipient's payments to the widow's closed joint account and allowed the widow to transfer funds from the closed account to the new one held in her name. *Id.* *Thomas* thus discloses situations in which the bank had at least constructive knowledge of Recipients' deaths but continued accepting benefit payments for those Recipients.

In *Derryberry*, one bank failed and was taken over by another bank. 1998 WL 93275, at *1. An employee at the former bank, who continued working for the bank when it was taken over, knew the Recipient had died, yet the successor bank continued to accept the deceased Recipient's VA benefits for deposit. *Id.* at *4. The Court determined that the successor bank had not conclusively established that it did not have knowledge of the Recipient's death when it took over the former bank. *Id.* at *5. The Court finds that the Government could infer fraud as one possible cause of the bank's failure to cease payments. *See Solomon*, 878 F.3d at 146 ("We are not concerned however, with the overall probability of someone inferring fraudulent activity from the public disclosures. The focus is on whether they *could have* made the inference." (citing *Jamison*, 649 F.3d at 331)). *Derryberry*, like *Thomas*, involved a situation in which the bank had at least constructive knowledge of a Recipient's death yet continued to deposit benefit payments to that Recipient's account.[22]

In *United States v. Morris*, the bank advised the deceased Recipient's daughter that it was her responsibility to notify the VA of the Recipient's death and close her mother's account. 284 F. App'x 762, 763 (11th Cir. 2008). The daughter failed to do so, and the VA continued making

---

[22] The Court has only considered *Derryberry*, a state court case, for acts occurring before the public-disclosure bar was amended on March 23, 2010.

deposits to the decedent's account for three years after her death. *Id.* Again, this case exemplifies the scheme alleged by Relator—the bank knew the Recipient had died but failed to stop accepting benefit payments or to notify the relevant agency.

The final three sources, *United States v. Walker*, the 1987 Banking Circular, and the 2012 SSA Report, furnish even more evidence of the alleged fraudulent scheme. *Walker* discloses the crux of Relator's alleged scheme—a bank knew of a Recipient's death but failed to properly close his account. 563 F. Supp. 805, 807 (S.D. Iowa 1983). Further, the SSA made payments it would not have made had "the bank . . . informed the government of his death as [it was] required to do by law." *Id.* at 809.

The 1987 Banking Circular warned that "some financial institutions" had accumulated funds that could not be posted to a customer's account. Defs.' App. Ex. G, at 26. The Banking Circular noted that "some financial institutions, upon learning of the death of a recipient or beneficiary, place[d] payments in holding ("suspense") accounts until a reclamation action [was] received." *Id.* at 27. This document discloses evidence of the scheme alleged by Relator—that banks knew of Recipients' deaths yet failed to stop accepting benefit payments. The Banking Circular adds to the cases discussed above, as it makes clear that the problem is not limited to one or two specific banks.

Similarly, the 2012 SSA Report[23] noted that the OIG "identified several instances where banks were maintaining accounts that had been inactive for many years, with the exception of direct deposits of SSA benefit payments." Defs.' App. Ex. P, at 186. An account being inactive may provide a bank with constructive knowledge that the accountholder has died. Although this report does not dictate a finding that fraud has occurred, it details the critical elements of the

---

[23] SOC. SEC. ADMIN., OFFICE OF THE INSPECTOR GEN., AUDIT REPORT: USING MEDICARE CLAIM DATA TO IDENTIFY DECEASED BENEFICIARIES (2012), https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-08-09-19105.pdf.

scheme alleged by Relator with the same level of specificity as does the Amended Complaint. *See Jamison*, 649 F.3d at 327 ("[F]or the public-disclosure bar to apply, the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint, because that is all that is needed for the action to be 'based on' the public[ly] disclosed allegations.").

Considering these public disclosures as a whole, the Court finds that the critical elements of the alleged fraudulent scheme were in the public domain and that the allegations in Relator's Amended Complaint are based upon and substantially the same as the allegations contained in certain of the public disclosures.

### iv. *Original Source*

Because the Court has found that there has been a public disclosure and that the instant action is based upon that disclosure, the Court cannot maintain the action unless Relator is the original source of the information. Under the 1986 version of the FCA, an original source is an individual who voluntarily provides information to the Government *and* who has direct and independent knowledge of the information on which his allegations are based. *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004). Under the 2010 version of the statute, a relator must "voluntarily disclose[] to the Government the information on which allegations or transactions in a claim are based" prior to a public disclosure *or* have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and "voluntarily provide[] the information." 31 U.S.C. § 3730(e)(4)(B) (2010). Thus, under both statutes, whether or not the relator provides information voluntarily is dispositive.

### a. *Voluntary Disclosure*

The Court finds that Relator's disclosure was not voluntary. As such, Relator cannot be an original source. The Fifth Circuit has held that "the fact that a relator 'was employed specifically to disclose fraud is sufficient to render his disclosures nonvoluntary.'" *See Little*, 690 F.3d at 294 (quoting *United States ex rel. Fine v. Chevron, U.S.A.*, 72 F.3d 740, 744 (9th Cir. 1995) (en banc)). It is undisputed that Relator was an employee of the OIG. He was hired to investigate and disclose fraud. Thus, he cannot satisfy the voluntariness requirement. *See Mission, Vision, and Values*, DEP'T OF VETERANS AFFAIRS, OFFICE OF INSPECTOR GEN., https://www.va.gov/oig/about/default.asp (last visited October 18, 2018) ("[T]he [OIG] will . . . prevent and address fraud, waste, and abuse[.]").

### b. *Knowledge*

Additionally, for purposes of conduct occurring prior to March 23, 2010, the Court finds that Relator does not have direct and independent knowledge about post-death payments from agencies other than the VA. Relator's work at the VA may have provided him with direct and independent knowledge of VA payments, but it is difficult to imagine how he would have gained such knowledge of payments from other agencies. Only one of the examples in the Amended Complaint involves a loss by an agency other than the VA, yet the Amended Complaint purports to disclose a widespread fraudulent scheme impacting the SSA, OPM, and RRB, in addition to the VA. Relator has failed to provide facts from which the Court could determine that he had direct and independent knowledge of fraud impacting agencies other than the VA.

Relator also cannot establish that he is an independent source under either provision of the 2010 version of the public-disclosure bar. For the same reasons listed above, the Court finds that Relator does not have independent knowledge. Further, the Court finds that Relator's knowledge

does not materially add to the publicly disclosed transactions. The burden is on Relator "to show that the information and allegations he discovered were 'qualitatively different information than what had already been discovered' and not merely the 'product and outgrowth' of publicly disclosed information." *United States ex rel. Fried v. West Indep. Sch. Dist.*, 527 F.3d 439, 443 (5th Cir. 2008) (quoting *Fed. Recovery Servs.*, 72 F.3d at 452). The information in Relator's Amended Complaint, including his nonspecific examples of conduct by Defendants, does not "translate into some additional compelling fact" or "demonstrate a new and undisclosed relationship between disclosed facts." *Reagan*, 384 F.3d at 179. Thus, Relator has not met his burden.

Because the Court finds, under both versions of the public-disclosure bar, that there has been a disqualifying public disclosure and that Relator is not an original source, the Court grants Defendants' Motion to Dismiss on public disclosure grounds.[24]

### C. *Failure to State a Claim*

Because it is unclear whether the public-disclosure bar remains jurisdictional, it is also unclear whether it is appropriate for the Court to further analyze the Motion to Dismiss after determining that the bar applies. For the sake of completeness, however, the Court will briefly address Defendants' Motion to Dismiss on Rule 12(b)(6) and Rule 9(b) grounds. Even if there

---

[24] In the alternative, if necessary, the Court converts Defendants' Motion to Dismiss on public disclosure grounds into a motion for summary judgment. *See supra* note 7. The Court previously found that if the public-disclosure bar is now an affirmative defense, Defendants have met the burden of establishing the elements of this defense. Accordingly, the Court would grant Defendants' motion for summary judgment and dismiss with prejudice Relator's claims.

was no public disclosure, the Court would dismiss Relator's action for failure to allege details of the purported scheme with the particularity required by Rule 9(b).

### i. *The Rule 12(b)(6) Standard*

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

In ruling on a Rule 12(b)(6) motion, the court limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). However, the court may also consider documents outside of the pleadings if they

fall within certain limited categories. First, the "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, the "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (internal citations omitted); *see also, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand." (internal citations omitted)).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

### ii. *The Rule 9(b) Standard*

"[A] complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)[.]" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Rule 9(b) requires that "[i]in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b)

requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). Put simply, Rule 9(b) requires the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

As discussed above, Relator asserts a reverse false claim under § 3729(a)(1)(G) of the FCA. Where, as here, a relator alleges that a defendant failed to disclose and return an overpayment, liability requires proof of the following elements: (1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the Government; and (5) the misrepresentation is material. *United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, Civ. A. No. 3:14-CV-00118-M, 2016 WL 5661644, at *11 (N.D. Tex. Sept. 30, 2016) (citing *United States ex rel. Ligai v. ETS-Lindgren Inc.*, Civ. A. No. H-112973, 2014 WL 4649885, at *12 (S.D. Tex. Sept. 16, 2014)). The reverse false claims provision also imposes liability where a defendant concealed its obligation to return payments. *See Ligai*, 2014 WL 4649885, at *12-*13 ("[Section 3729(a)(1)(G)] provides both a false-record and fraudulent-concealment provision applicable to reverse false claims.").

### iii. *Analysis*

#### a. *Failure to Satisfy Rule 9(b)*

Defendants argue that the Amended Complaint fails to satisfy the strictures of Rule 9(b). Defendants argue that Relator has failed to plead particular details of the overall scheme and attack

the element of scienter. Under the *Grubbs* standard, which both parties agree applies in the instant case, Relator may survive a motion to dismiss by alleging "particular details of a scheme . . . paired with reliable indicia that lead to a strong inference that" Defendants actually violated the FCA. 565 F.3d at 190. In announcing this standard, the *Grubbs* court noted that "Rule 9(b)'s ultimate meaning is context specific" and that "no single construction of Rule 9(b) . . . applies in all contexts." 565 F.3d at 188 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). Although *Grubbs* involved a claim under § 3279(a)(1) of the FCA, the Court finds the standard announced in that case both relevant to and useful in the instant case.

The scheme alleged by Relator is as follows: "(1) The Banks received DNEs for deceased individuals that kept getting Government payments; (2) The Banks had an obligation to return those funds and tell the Government agency to stop paying because the person died; (3) The Banks did not do so; and (4) The Banks acted with the requisite False Claims Act 'knowledge[.]'" Rel.'s Suppl. Mem. in Opp'n 16 [ECF No. 129]. Relator also alleges a separate but closely linked violation: banks falsely certified when they had learned of Recipients' deaths when responding to NORs. Applying the *Grubbs* standard, the Court finds that Relator's allegations do not include "particular details" of the alleged scheme and lack the "reliable indicia" necessary to satisfy the strictures of Rule 9(b).

### 1. *Particular Details*

As Defendants aptly state, Relator fails to include almost any particular details of the alleged scheme, such as "the subset of recipient deaths that Defendants supposedly exploited[,]"

the "person at each bank who may have driven the scheme, or any characteristic of the recipients that made them ripe for the purported fraudulent scheme." Defs.' Br. 37 [ECF No. 94].

Relator's Amended Complaint is especially deficient with regard to the "who" of the alleged scheme. Other than in the representative list of examples he provides, Relator entirely fails to distinguish between Defendants. *See In re Parkcentral Glob. Litig.*, 884 F. Supp. 2d 464, 470-71 (N.D. Tex. 2012) ("Rule 9(b) requirements must be met as to *each* defendant. It is impermissible to make general allegations that lump all defendants together . . . ." (emphasis added)). Further, the examples Relator does provide are insufficient evidence from which the Court can infer a scheme to violate the FCA. And, despite alleging that the RRB and OPM were defrauded pursuant to the alleged scheme, the Amended Complaint is almost completely devoid of details relating to any agency other than the VA.

The Amended Complaint also lacks necessary details with regard to the "what" and "how." Critically, Relator omits particular details about the allegation upon which the entire scheme alleged by Relator relies: that Defendants received notice of Recipients' deaths through the receipt of DNEs. "In accordance with SSA DNE procedures," Relator contends, "the Defendant banks receive a SSA DNE on the day after a death termination is displayed . . . . By virtue of this procedure, each Defendant bank would have been in possession of an electronic record notifying it of the beneficiary's death." Am. Compl. ¶ 39. Relator does not, and cannot, allege that a DNE was indeed sent or received every time Defendants failed to stop accepting payments and notify federal agencies that a Recipient had died. Instead, he relies on the SSA's policy, as reflected in the agency's POMS, GN 02408.605. *See* Defs.' App. Ex. M. The manual states that "a DNE *normally* goes out as soon as SSA receives" information about a Recipient's death. *Id.* at 140 (emphasis added). Further, the manual states that, "On the day after a death termination is

displayed . . . , SSA passes a DNE to the Richmond Federal Reserve Bank (RFRB) . . . . RFRB then passes the information through the [ACH] to the [RDFI]." *Id.* at 141. Then, the RDFI is supposed to "return[], within three days, any additional government benefit payments that arrive for this [Recipient]." *Id.* For already-posted payments, the RDFI "has the option of waiting for a [NOR] before returning the funds to the agency." *Id.*

Defendants repeatedly counter that the DNE process is woefully inadequate because not all agencies issue DNEs and because the Government has a difficult time keeping track of Recipient deaths. And, in the examples provided by Relator, there is no allegation that a DNE was sent to or received by any of the Defendants. Without more information, the Court cannot assume that a DNE is sent and received every time a Recipient dies. Therefore, the Court finds that this allegation is insufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Even if the Court accepts as true Relator's allegation that SSA sent a DNE each time a Recipient died, there is no explanation of, much less any particulars of the alleged fraud, how the scheme operated from that point forward. Relator fails to allege any details, such as who at the bank would receive the DNE, how it would be processed, or how the notification system should have worked. In sum, the Amended Complaint is devoid of the particular details required by Rule 9(b) and *Grubbs* that would demonstrate that the failure to stop accepting payments or to return payments already posted resulted from fraud, as opposed to administrative oversight or mistake.

### 2.  *Reliable Indicia*

Even assuming that Relator has included particular details of the alleged scheme, the Amended Complaint lacks the "reliable indicia" needed to satisfy the requirements of Rule 9(b) with respect to each defendant. "Rule 9(b) is intended to give a defendant a reasonable ability to

investigate and to respond when charged with something as serious as fraud." *Dalwadi v. Holiday Hosp. Franchising, Inc.*, Civ. A. No. H-16-2588, 2017 WL 4479962, at \*7 (S.D. Tex. July 5, 2017).

Relator, relying on *Grubbs*, argues that pleading details of his personal knowledge of the recurring problem he uncovered satisfies his obligation to offer "reliable indicia" that an FCA violation occurred. *See* Rel.'s Mem. in Opp'n 30 [ECF No. 102] ("Relator's experience and position establishes . . . sufficient 'reliable indicia' to support his allegations . . . that the Banks received the DNEs as claimed."). The *Grubbs* court found that, in a situation where "the particular workings of a scheme [were] communicated directly to the relator by those perpetrating the fraud," the relator's personal knowledge sufficed. 565 F.3d at 191. However, the *Grubbs* relator's personal knowledge is completely distinguishable from Relator's knowledge in the instant case. In *Grubbs*, the relator "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors . . . attempted to bring him into the fold of their on-going fraudulent plot." 565 F.3d at 191-92. He corroborated this allegation with descriptions of a meeting with nurses who tried to help him carry out the scheme, along with specific dates on which "each doctor falsely claimed to have provided services to patients." *Id.* at 192. Taken together, these allegations were sufficient to allege fraud.

By contrast, Relator offers a sweeping description of an alleged scheme implicating many financial institutions and involving several federal agencies. His allegations are corroborated only by unadorned examples of instances in which VA payments continued after SSA payments had stopped and conclusory allegations that unnamed representatives of unidentified banks confirmed that those banks intentionally continued making payments after learning of a Recipient's death. These allegations simply are not sufficient, under any reading of Rule 9(b), to support the inference

that Defendants' actions constituted fraud, rather than innocent mistake, negligence, or a regulatory violation.

Rule 9(b), in addition to ensuring fair notice, "also prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a 'fishing expedition.'" *Grubbs*, 565 F.3d at 191. Critically, in *Grubbs*, the particular details and reliable indicia offered by the relator "limit[ed] any 'fishing' to a small pond that [was] either stocked or dead." *Id.* Relator's allegations, by contrast, could give him access to an ocean of potential claims. To adequately defend themselves, all fifteen Defendants[25] would need to investigate the accounts of every Recipient who has died (and, presumably, stopped receiving SSA benefits) since February 2, 2010. The banks do not know whether they are on the hook for failing to notify an agency of a Recipient's death, improperly responding to an NOR (that may or may not have been sent), or both. Rule 9(b) prohibits access to such a vast expanse of claims without substantially more particularized pleadings.

### 3.    *Strong Inference that Defendants Violated the FCA*

Because Relator's Amended Complaint lacks both particular details and reliable indicia, it does not lead to a strong inference that the FCA has been violated. Relator's allegations fail to move the needle from "innocent mistakes or negligence" to affirmative fraud. *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 681 (5th Cir. 2003); *see also Universal Health Servs. Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) (observing that the FCA "is not an

---

[25] The Court does not include Compass Bank in this total. Relator voluntarily dismissed Compass Bank, as noted above. *See supra* note 1.

all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." (internal quotation marks and citation omitted)).

#### 4. *Scienter*

Relator's vague group pleading approach cripples his ability to establish scienter. To establish scienter, Relator must allege that Defendants acted "knowingly." 31 U.S.C. § 3729(a)(1)(G). To allege that Defendants acted "knowingly," Relator must allege that they knew they were misrepresenting their knowledge of Recipients' deaths, they deliberately remained ignorant, or they recklessly disregarded the accuracy of their representations. *Id.* § 3729(b)(1)(A). "Allegations of scienter may be averred generally, but simple allegations of fraudulent intent will not suffice, and 'plaintiffs must set forth *specific facts* supporting an inference of fraud.'" *In re Parkcentral Glob. Litig.*, 884 F. Supp. 2d at 471 (quoting *Litson-Gruenber v. JPMorgan Chase & Co.*, Civ. A. No. 7:09-CV-056-O, 2009 WL 4884426, at *4 (N.D. Tex. Dec. 16, 2009)).

Defendants argue that banks are incentivized not to lie because they bear any loss to the Government first, even if they are blameless. *See* 31 C.F.R. § 210.10(a) ("An RDFI shall be liable to the Federal Government for the total amount of all benefit payments received after the death or legal incapacity of a recipient or the death of a beneficiary unless the RDFI has the right to limit its liability . . . ."). Relator responds that the Court can infer scienter because the misconduct was routine, representatives of the banks allegedly admitted to investigators that they knowingly accepted payments for deceased Recipients, each bank was a knowledgeable ACH participant, and the banks had a business inventive to continue receiving payments. Thus, Relator argues, "[i]t is certainly reasonable for this Court to infer . . . that . . . the Banks knew how to follow ACH

regulations, were more than capable of doing so, failed to do so on a routine basis, and benefitted as a result of such misconduct." Rel.'s Mem. in Opp'n 33 [ECF No. 102].

As noted above, the Court finds that Relator has insufficiently pleaded the alleged misconduct. Therefore, the Court cannot conclude that there was any routine misconduct. Relator fails to identify which banks' representatives allegedly confirmed misconduct to investigators, so that alleged fact also does not support an individualized finding of scienter. And, as Defendants note, RDFIs have an incentive *not* to continue receiving payments. The competing incentives faced by RDFIs undercut Relator's argument that the Court can infer scienter based on what Defendants stand to gain.

The argument that Defendants are knowledgeable ACH participants has weaknesses as well. While Relator points to one provision of the Green Book, 5-8, that requires RDFIs to *immediately* return payments after a Recipient dies, Defendants point to another provision of the Green Book, 5-9, that uses more lenient language. FCA liability does not attach when a defendant reasonably, yet erroneously, interprets its legal obligations. *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015).; *see also United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 437 (6th Cir. 2016) (noting that FCA's scienter standard "requires plaintiffs to prove that the defendant knows that he violated an obligation, not simply that he mistakenly interpreted a legal obligation.").

For the foregoing reasons, the Court finds that Relator has not sufficiently pleaded scienter. Because of this deficiency, along with those discussed above, the Court grants Defendants' Motion to Dismiss based on Rules 12(b)(6) and 9(b).

### b. *Arguments not Reached*

Defendants also allege that many of the examples of specific misconduct are time-barred under Part 210 and that that the claims against Citibank, M&T Bank, PNC Bank, Frost Bank, American National Bank, Centrue Bank, and Amarillo National Bank should be dismissed. Because the Court has already elucidated two separate and independent grounds for dismissal, the Court declines to reach these arguments and expresses no opinion on them.

### c. *Conflict of Interest*

Defendants argue that Relator's request for a share of any monetary relief won should be stricken pursuant to federal conflict-of-interest rules. Because the Court grants Defendants' Motion to Dismiss, it need not consider this request and finds that it is moot.

### D. *Statute of Limitations*

Defendants move for dismissal of all claims arising more than before six years before Relator filed his complaint on February 2, 2016. At the hearing held on May 10, 2018, counsel for Relator stipulated that Relator was not "seeking damages prior to six years from the filing of the original complaint." Hr'g Tr. 85:18-19. Thus, only claims that arose on or after February 2, 2010, remain at issue in this case, and Defendants' Motion to Dismiss on limitations grounds is moot.

## III. CONCLUSION

For the foregoing reasons, the Court denies the Motion to Dismiss on standing grounds. The Court denies as moot Defendants' Motion to Dismiss on statute of limitations grounds. The Court grants the Motion to Dismiss on public disclosure grounds and for failure to state a claim.

Because there has been a disqualifying public disclosure, the Court finds that amendment would be futile and dismisses Relator's lawsuit with prejudice.

**SO ORDERED.**

SIGNED October _26_, 2018.

KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE